OPINION OF THE COURT
John S. Lockman, J.
Having presided at what appears to have been the first trial of a matrimonial action under the so-called “equitable distribution” law (Domestic Relations Law, § 236, part B), this court must now embark upon what is a maiden voyage in this State. Adding somewhat to the complexity is the fact that the case involves the valuation of a closely held, quasi-professional, corporation. The waters are not uncharted, however. The experiences of courts in our sister State provide valuable polestars to guide our course.
Doctor and Mrs. Nehorayoff were married on April 4, 1963, in Iran, where both had been born. It appears that they were cousins and that his brother was .married to her sister. At the time of their marriage Dr. Nehorayoff had already graduated from medical school. Mrs. Nehorayoff, on the other hand, had only a sixth grade education. Very shortly after their marriage, the couple came to the United States where the doctor served his internship and resi *312 dency at various hospitals in the metropolitan area. Meanwhile, their first child, Liza, was born on October 5, 1964.
Upon her arrival in the United States, Mrs. Nehorayoff worked as a waitress and later was employed as a cashier in a supermarket. The period of such employment was apparently brief because she had also attended beauty school prior to the birth of Liza in 1964. After Liza was born, Mrs. Nehorayoff worked briefly as a cosmetician earning approximately $25 per week but then began attending school in pursuit of a high school equivalency diploma. School was at night and Doctor Nehorayoff stayed home and watched Liza. At some point Mrs. Nehorayoff also worked briefly as a real estate sales person earning approximately $500.
In 1968, the Nehorayoffs returned to Iran and Dr. Nehorayoff served a tour in the Iranian army. Their second child, Steven, was born in Iran on December 21, 1970. After the doctor’s army service, the Nehorayoffs returned to this country. The doctor secured employment at various hospitals and Mrs. Nehorayoff pursued further education. Eventually Mrs. Nehorayoff graduated from college and received a B.B. A. In the beginning of 1978, Dr. Nehorayoff and another physician formed Plaza Women’s Medical Center Realty, Inc. The corporation provides medical and laboratory services primarily related to the termination of pregnancies. Doctor Nehorayoff, who is an obstetrician and gynecologist, is the primary physician performing the abortions. In October of 1979, Mrs. Nehorayoff opened a restaurant known as Violette’s Cuisine.
DIVORCE
In October of 1978, Mrs. Nehorayoff had occasion to obtain an order of protection against her husband from Family Court. That order expired on October 30,1979. One day in January, 1980, while Mrs. Nehorayoff was at work one of her daughter’s friends Jburst into the restaurant in an agitated state to report that Dr. Nehorayoff was administering corporal punishment to Liza. After stopping briefly at home, Mrs. Nehorayoff went to the police who accompanied her back to the marital residence. Once there, Dr. Nehorayoff told her that he was “going to kill her.” *313 Mrs. Nehorayoff left and returned the following morning. The doctor chased her from the house and once again she went to the police. The next day she again returned to the home only to find her clothing in a trash bag in the basement. Subsequently, she discovered that the furniture and dishes had been removed from the marital abode. Dr. Nehorayoff visited his wife at her restaurant seeking the whereabouts of their daughter who had apparently run away. When Mrs. Nehorayoff professed ignorance, the doctor began throwing dishes and a lamp at her. The police were called and eventually persuaded him to leave although he lurked outside the building for a time. After securing a new order of protection from Family Court, Mrs. Nehorayoff returned to thé marital abode in March of 1980. The actions of Dr. Nehorayoff constitued cruel and inhuman treatment and rendered it unsafe for Mrs. Nehorayoff to cohabit with him. (Domestic Relations Law, § 170, subd [1]; Echevarria v Echevarria, 40 NY2d 262; Cataudella v Cataudella, 74 AD2d 893.)
EQUITABLE DISTRIBUTION
The complaint is dated March 18, 1980, and the summons was obviously served considerably prior to July 19, 1980, the effective date of the so-called “equitable distribution” law. (Domestic Relations Law, § 236.) On March 3, 1980, during a proceeding in Family Court, the parties stipulated that “in the event an action is brought in the Supreme Court *** under the current Domestic Relations Law and the General Obligations Law effecting matrimonial actions, should the law change during the course of litigation, the party bringing the action shall have the right to invoke the provisions of those laws as if the action was brought thereunder.” What eventually became part B of section 236 of the Domestic Relations Law was then pending before the Legislature and was the change in law contemplated by the parties when they entered into the stipulation. Assuming inaction by the doctor, Mrs. Nehorayoff could have availed herself of the new statute by waiting to commence her action until after July 19,1980. Instead, in reliance upon the stipulation, she commenced her action in March of 1980. Having created this situation by entering into the stipulation, Dr. Nehora *314 yoff is estopped from asserting that the old provisions of section 236 of the Domestic Relations Law (amended to the extent that they are now gender-neutral [Domestic Relations Law, § 236, part A]) should govern. (Matter of Farina v State Liq. Auth., 20 NY2d 484, 492.) The court can conceive of no public policy which might prevent application of part B of section 236 of the Domestic Relations Law to this case.
Section 236 (part B, subd 5) of the Domestic Relations Law provides that the parties’ separate property shall remain separate and that their marital property shall be equitably distributed in accordance with the circumstances of the case and of the parties and 10 factors which the court is required to consider. While the court cannot distribute separate property, its value is nevertheless of some significance since one of the factors which the court is required to consider is “the probable future financial circumstances of each party”. (Domestic Relations Law, § 236, part B, subd 5, par d, cl [8].) “Separate property” means:
“(1) property acquired before marriage or property acquired by bequest, devise, or descent, or gift from a party other than the spouse;
“(2) compensation for personal injuries;
“(3) property acquired in exchange for or the increase in value of separate property, except to the extent that such appreciation is due in part to the contributions or efforts of the other spouse;
“(4) property described as separate property by written agreement of the parties pursuant to [section 236 (part B, subd 3) of the Domestic Relations Law].” (Domestic Relations Law, § 236, part B, subd 1, par d.)
During a proceeding in this court before Justice Roncallo on January 9, 1979, the parties entered into a stipulation with regard to certain property. A judgment based upon that stipulation and granted by Justice Roncallo on February 5,1979 established that certain funds, oriental rugs, jewelry and gold coins were the sole and exclusive property of Mrs. Nehorayoff. Some of this property was invested in a restaurant which Mrs. Nehorayoff owns and operates. Evidence offered by Mrs. Nehorayoff that the restaurant has *315 not appreciated in value since its founding and is without current value stands uncontradicted. The court notes, however, that the restaurant’s balance sheet lists as a liability some $60,000 as an indebtedness to Mrs. Nehorayoff which must be considered as one of her assets even if it is separate property. Similarly, Mrs. Nehorayoff’s indebtedness of $32,500 to her husband is his separate property and an asset to him having a value of $32,500. Mrs. Nehorayoff’s separate property consisting of jewelry and gold coins has a value of approximately $22,000 by stipulation and Dr. Nehorayoff offered no evidence that this property had ever appreciated in value. The judgment granted by Justice Roncallo also establishes that two 9 x 12 carpets, one a Mahal worth $5,000 and the other a Kashan worth $4,000, are Mrs. Nehorayoff’s separate property.
“Marital property” is defined to mean “all property acquired by either or both spouses during marriage and before *** the commencement of a matrimonial action, regardless of the form in which title is held” (Domestic Relations Law, § 236, part B, subd 1, par c). Certain oriental rugs were acquired during the marriage by purchase from joint funds and others were received as wedding gifts. The rugs purchased with joint funds during marriage are clearly matrimonial property. Mrs. Nehorayoff testified that some of those which were gifts were given by her relatives and were intended to be her sole property. This otherwise unsubstantiated assertion was contradicted by Dr. Nehorayoff. “[A]ll wedding gifts, whether from the bride’s ‘side’ or from the groom’s excepting such items which are peculiarly adaptable to the personal use of either spouse, and those gifts which are specifically and unequivocally ‘earmarked’ as intended exclusively for the one or the other of the spouses, commonly intended for general use in the household, are the joint property of both parties to the marriage.” (Avnet v Avnet, 204 Misc 760, 768; Coppola v Coppola, 18 AD2d 1004.) The court finds that with the exception of the two rugs determined to be separate property of Mrs. Nehorayoff by Justice Roncallo all of the oriental rugs are matrimonial property and have a combined value of $50,000 based upon the testimony of the oriental rug expert.
*316 No claim has been made that the matrimonial residence is other than matrimonial property. The court finds that it has a net value after liabilities of $100,000. The furnishings are also matrimonial property and have a value of $15,000. Another item of matrimonial property is a certain painting about which there was offered no evidence of value other than the husband’s statement of net worth. Based upon that uncontradicted averment, the court finds that the painting has a value of $5,000.
The parties own two automobiles: a 1979 Volvo which the husband drives and a 1978 Mercedes which the wife uses. There is an indebtedness of $7,000 on the Volvo and $3,200 on the Mercedes. The net value of the Mercedes exceeds that of the Volvo by $2,300.
The most vigorously contested issue in this case was the value of Dr. Nehorayoff’s half interest in Plaza Women’s Medical Realty, Inc., a closely held corporation primarily engaged in the termination of pregnancies and related laboratory work. Each side called an expert witness as to value. Mrs. Nehorayoff’s expert testified that in his expert opinion the value of the half interest was in the range of $675,000 to $1,350,000. The doctor’s expert testified that in his expert opinion the corporation had no value.
The valuation of closely held and professional corporations is a difficult problem confronting the courts with increasing frequency. To date no consistent approach to valuation has been arrived at. (See Matter of Webb, 94 Cal App 3d 335; Matter of Barnert, 85 Cal App 3d 413; Hurley v Hurley, 94 NM 641; Matter of Freedman, 23 Wash App 27; Matter of Campbell, 22 Wash App 560; Matter of Hinrichs, 37 Ore App 833; Miranda v Miranda, 596 SW2d 61 [Mo]; Lockwood v Lockwood, 205 Neb 818; Stern v Stern, 66 NJ 340; Levy v Levy, 164 NJ Super 542.) The most comprehensive method of valuation available is to be found in the Internal Revenue Service’s Revenue Ruling 59-60 (IRS, Internal Revenue Bulletin [1959], p 237) and the introduction to this approach warns “A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance.” (Id., at p 238.) *317 Revenue Ruling 59-60 identifies eight fundamental factors which should be analyzed in arriving at a valuation:
(1) The nature of the business and the history of the enterprise from its inception.
(2) The economic outlook in general and the condition and outlook of the specific industry in particular.
(3) The book value of the stock and the financial condition of the business.
(4) The earning capacity of the company.
(5) The dividend-paying capacity.
(6) Whether or not the enterprise has goodwill or other intangible value.
(7) Sales of the stock and the size of the block of the stock to be valued.
(8) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market.
Both expert witnesses were familiar with Revenue Ruling 59-60 and professed to have used it in arriving at their valuations.
As previously noted, Plaza Women’s primary business is abortions and related laboratory work. It was established in January of 1978 and ended its first nine-month fiscal year on September 30, 1978, with gross revenues of $230,000. Gross revenues rose to $448,000 in fiscal 1979 and fell back to $374,000 in fiscal 1980. Through a comparison of actual pátient cards and the corporate books, Mrs. Nehorayoff was able to demonstrate that between July 27, 1979 and March 3, 1980 over $26,000 in cash paid by patients was not recorded in the corporate books. Dr. Nehorayoff’s explanation of this discrepancy was wholly inadequate.
Neither expert concerned himself with the general economic situation perhaps because there has been a relative stability in the New York metropolitan area and prospects for the future are not markedly different. The abortion industry itself, if it may be described as such, appears to be well entrenched. While the industry is highly competitive *318 and the mortality rate among enterprises is relatively high, some clinics appear to have become well established.
A valuation of the net assets of a closely held corporation may be helpful in valuing the corporation in certain industries such as beverage distribution or wholesale food. (Dean v Dean, 87 Wisc 2d 854; Miranda v Miranda, 596 SW2d 91 [Mo], supra). Here the resulting valuation would be misleading. Plaza Women’s was begun with a $500 investment by each of the two principals. The premises are leased and the lease will soon expire. Whatever equipment is used has little resale value. Patients customarily pay cash so that there are no receivables. In short, the net asset value is negligible. This method of valuation, however, ignores the going concern or goodwill value of the enterprise. (Matter of Hinrichs, 37 Ore App 833, supra.)
While Revenue Ruling 59-60 separates the financial condition of the business and its earning capacity, this court finds it difficult to discuss them as separate items. Both experts agreed and Revenue Ruling 59-60 itself states that dividends actually paid by a closely held corporation are not usually an accurate measure of its earning capacity. Where the principals of the corporation are also officers and employees, earnings may be paid out in the form of salary to avoid a double taxation. To accurately determine earnings the court must determine what is a reasonable compensation for the services rendered and subtract that from what was actually paid. The result of this subtraction would represent earnings. The evidence offered of Dr. Nehor ay off’s compensation from Plaza Women’s was based on his tax year which is a calendar year. There was thus some difference between the corporate records based on an October 1 to September 30 fiscal year and the doctor’s calendar year tax records. In addition, Dr. Nehor ay off was able to receive direct compensation for certain medical services under an arrangement intended to compensate him for the fact that he had to pay his own malpractice insurance. Under such circumstances there is a relationship, but not a mathematical. equivalency between the compensation for Dr. Nehor ay off recorded on the corporate books and his actual income from Plaza Women’s. In the first nine-month fiscal year, Plaza Women’s had gross *319 revenues of $230,000 and Dr. Nehorayoff earned $96,000. It would have cost $48,000 to hire a physician to perform the services performed by Dr. Nehorayoff, prorating a $60,000 annual salary over nine months. Earnings were thus approximately $48,000. Gross revenues rose to $448,000 in the second year and Dr. Nehorayoff earned $140,000. Plaza Women’s would have had to pay a physician $76,000 to perform the services performed by the doctor with the increase attributable to malpractice insurance. Earnings on the doctor’s half interest for the second year were approximately $64,000.
To analyze the third fiscal year, certain additional factors must be considered. Reported gross revenues were $374,000 and Dr. Nehorayoff had an income of $71,000. The cost of a replacement physician rose to $80,000. However, the third fiscal year overlaps with the July 27, 1979 to March 3,1980 period in which Mrs. Nehorayoff was able to demonstrate the existence of over $26,000 in unreported cash receipts. The period encompasses the onset of serious marital difficulties. Moreover, in May of 1980, Plaza Women’s opened a special account for the avowed purpose of concealing Dr. Nehoray off’s assets from possible creditors. No satisfactory explanation was offered for the fact that Dr. Nehoray off’s reported income fell by 50% while Plaza Women’s earnings fell only 17%. In any event, in light of the demonstrated inaccuracies in the figures for the third fiscal year, the court finds that there were earnings on Dr. Nehoray off’s half interest of at least $50,000.
Once earnings have been determined, one recognized method of valuation is the “capitalization of earnings”. (1 Dewing, Financial Policy of Corporations [5th ed], p 379 et seq.) Under this method one ascertains what would be an appropriate return upon an investment in such an enterprise taking into consideration its nature, the risks involved, its past performance and its prospects for the future. This was the method relied upon by plaintiff’s expert who used a factor of 15 as a multiple. The factor is generally arrived at by determining what would be a fair return on an investment stated as a percentage and then converting the percentage to a multiple with certain adjustments. If a 10% return were fair, the multiple would be *320 10 all things being equal. If the venture had a high risk such that a high return of perhaps 20% were needed to stimulate investment, then the multiple would be 5. The factor of 15 used by the plaintiff’s expert exceeds the factor assigned for the most conservative, low risk type of enterprise generally available: “Old established businesses, with large capital assets and excellent goodwill — 10%, a value ten times the net earnings. Very few industrial enterprises would come within this category.” (1 Dewing, Financial Policy of Corporations [5th ed], p 390.)
The doctor’s expert testified that by virtue of its nature the enterprise had no value. A review of the cases dealing with the valuation of medical practices, the category into which the witness placed Plaza Women’s, shows that such a contention has been universally rejected. (See, e.g., Hurley v Hurley, 94 NM 641, supra; Matter of Webb, 94 Cal App 3d 335, supra; Matter of Foster, 42 Cal App 3d 577.) In two cases a medical practice appears to have been valued at 25% of gross annual billings with minor adjustments for profitability, locale and related factors. (Matter of Barnert, 85 Cal App 3d 413, supra; Matter of Foster, supra.) More often, however, the method used has been a capitalization of goodwill value which in this case is synonymous with net annual earnings. (Hurley v Hurley, supra; Matter of Webb, supra; IRS, Internal Revenue Bulletin [1968], Revenue Ruling 68-633, p 329.)
The factor generally used in capitalizing the net earnings of a medical practice is 1. The rationale for this factor may be derived by comparing the following:
“5. Small industrial businesses, highly competitive, and requiring relatively small capital outlay. They are businesses which anyone, even with little capital, may enter — 25%, a value approximately four times the net earnings.
“6. Industrial businesses, large and small, which depend on the special, often unusual skill of one, or of a small group of managers. They involve only a small amount of capital; they are highly competitive and the mortality is high among those who enter the competitive struggle — 50%, a value approximately twice the net earnings.
“7. Personal service businesses. They require no capital, or at most a desk, some envelopes and a few- sheets of *321 paper. The manager must have a special skill coupled with an intensive and thorough knowledge of his subjects. The earnings of the enterprise are the objective reflection of his skill; and he is not likely to be able to create ‘an organization’ which can successfully ‘carry on’ after he is gone. He can sell the business, including the reputation and the ‘plan of business,’ but he cannot sell himself, the only truly valuable part of the enterprise — 100%, a value equal, approximately, to the earnings of a single year.” (1 Dewing, Financial Policy of Corporations, p 391.)
Based on the testimony adduced and common sense, the normal medical practice clearly falls under “7”. If a patient is to be treated by a new physician, he might well choose his own rather than blindly accepting the physician to whom his former doctor has sold his practice. Plaza Women’s is not a conventional practice, however. The evidence indicates that the patient does not develop a personal relationship with the physician. One seeks out the clinic because of advertising, reputation or referral. Plaza itself has employed another physician to perform abortions. There is no reason to expect that a change in physicians would lead to a significant decline in business as it might in a private practice. While the industry is highly competitive, it does not necessarily fit easily within category “6”. This is not the type of key man enterprise there described. Dr. Nehorayoff and his partner have special skills in that they are medical specialists, but their skills are shared by other medical specialists who exist in not insignificant numbers in the population of this metropolitan area. Based upon the nature of this enterprise, its history and prospects and all of the facts and circumstances of the case, the court finds that the appropriate factor would be in the range of 3 to 4. Taking into consideration the actual and inputed earnings of the enterprise, the value of Dr. Nehor ay off’s interest in Plaza Women’s Medical Realty, Inc., in terms of the capitalization of net earnings is $200,000.
No evidence was offered of any transactions in the stock of Plaza Women’s nor of transactions in the stock of any comparable corporation.
To briefly recapitulate, the matrimonial property consists of the oriental rugs, the residence and furnishings, *322 the automobiles and the half interest in Plaza Women’s Medical Realty, Inc., which was acquired during marriage. In distributing these assets the court is required to consider the factors set forth in section 236 (part B, subd 5, par d) of the Domestic Relations Law.
There is little evidence of significant property or income at the time of the parties’ marriage 17 years ago. Dr. and Mrs. Nehorayoff are generally in good health with no prospect of any significant change. The court having awarded each parent custody of one of the children, neither requires exclusive use or occupancy of the marital residence which is far too large for their needs. It is to be sold. (Barcelow v Barcelow, 64 AD2d 1024; Dubno v Dubno, 51 AD2d 693.)
During the marriage Mrs. Nehorayoff has pursued her education and now holds a B. B. A. She is the owner and operator of a restaurant which she appears to be confident will succeed. She has equipped and situated herself to be able to be self-sufficient. Her professed goal in this litigation has been a clean break with emphasis on the distribution of current assets rather than future maintenance. After entry of a judgment in this case she should be possessed of substantial assets and earning capacity. Under all these circumstances an award of maintenance would be improvident.
No claim has been made with regard to any potential inheritance and there are no pension rights to be considered. There are virtually no liquid assets.
During the 17 years of the marriage Mrs. Nehorayoff has fulfilled the role of wife and mother. While attentive to her own needs and aspirations, she has not so neglected her responsibilities as to justify anything but an equal division of such conventional matrimonial property as the residence and furnishings, rugs and automobiles.
Mrs. Nehorayoff’s contribution with regard to Plaza Women’s Medical Center is markedly different, however. While she herself expended some minimal effort in its founding, she has made no further direct contribution. During the life of Plaza Women’s Mrs. Nehorayoff has been anything but the stereotypical housewife wholly devoted to *323 the care of her home, husband and offspring. Since September of 1979, she has devoted the vast bulk of her efforts to the founding and nurturing of her own restaurant business. Under such circumstances, her equitable share of Plaza Women’s is one quarter of her husband’s half interest.
After this distribution Mrs. Nehorayoff will have her separate property consisting of gold and jewelry worth $22,000, her oriental rugs worth $9,000 and her restaurant which is worth at least the $60,000 which it owes her. She will receive the Mercedes and become responsible for the related debt for a new value of $6,800. The marital residence and furnishings are to be sold and the proceeds divided yielding Mrs. Nehorayoff approximately $60,000. The jointly owned rugs are to be equally divided or sold and the proceeds divided for an asset having a value of $25,000. Against Mrs. Nehoray off’s $50,000 interest in Plaza Women’s may be set off $2,300 representing the difference in net asset value between the two family cars, $8,750 for one half of the joint indebtedness to Chase Manhattan Bank and $7,500 representing her half of the tax liability for 1979. Against the balance of $31,450 may be set off the $32,500 debt Mrs. Nehorayoff owes to the doctor in connection with the establishment of the restaurant.
The $19,000 debt to Brant Construction is a liability of the restaurant.
Dr. Nehorayoff will also realize $60,000 on the sale of the marital residence and furnishings. His share of the rugs or the proceeds of their sale will also be $25,000. So that he may maintain his full interest in Plaza Women’s, he is to assume the full $17,500 debt to Chase Manhattan and the full tax liability for 1979. He is also to forgive $31,450 of the debt owed by his wife in connection with the restaurant. He also owes the Bank Melli $8,000, National Bank of North America $16,000 and GMAC $7,000 on the Volvo. The mortgage and home improvement loans will be retired upon the sale of the residence.
CHILD SUPPORT
Dr. Nehorayoff has demonstrated a capacity to earn in excess of $100,000 annually. Mrs. Nehoray off’s earning *324 capacity is somewhat speculative and it is highly unlikely that it will rise to that level. Under these circumstances and in keeping with the standard of living during the marriage, it is appropriate to award Mrs. Nehorayoff child support in the amount of $100 per week. Dr. Nehorayoff has commendably assumed the obligation of providing for his children’s college education. If, as has been indicated, Liza attends a college outside the metropolitan area or boards at any college whatever its location, child support is to be suspended during the periods she is actually away from home and at school.
TAX CONSEQUENCES
The court is specifically required to consider the tax consequences of maintenance and child support. (Domestic Relations Law, § 236, part B, subd 6, par a, cl [7]; subd 7, par a, cl [4].) Here, maintenance has not been awarded and the tax consequences of the child support award is not particularly significant. There is learned opinion to the effect that since the court must consider the probable future financial condition of the parties, it must necessarily assess the tax consequences. Perhaps this is true where the parties furnish the court with evidence or argument which permits it to do so. They have not done so in this case and the court is ill equipped to undertake such a task on its own. In any event, the distribution here ordered does not on the record appear to impose an undue tax burden upon either party. If it should develop that it does, the parties in settling the judgment may ameliorate such consequences.
COUNSEL FEES
Both parties apply for an award of counsel fees. (Domestic Relations Law, § 237.) The court’s review of the financial condition of the parties and Dr. Nehoray off’s earning capacity preclude any award to him. (Lebensfeld v Lebensfeld, 72 AD2d 790.) Mrs. Nehoray off’s circumstances are somewhat different, however. Were she required to substantially deplete the assets herein awarded to compensate her attorney, the equity of the distribution would be called into question. (See Stern v Stern, 67 AD2d 253.) A hearing will be necessary to determine the reasonable value of the *325 services provided by plaintiff’s counsel. (Edelstein v Edelstein, 53 AD2d 595.) There is no further need to litigate the financial condition of the parties, however. Once the reasonable value of the services is determined, the court may make such award, if any, as it deems appropriate in the light of the distribution of marital property, denial of maintenance and award of child support.