OPINION OF THE COURT
Bernard F. McCaffrey, J.
This case involves three points arising under the Equitable Distribution Law on which there is little or no precedent. The court has been called upon in this litigation to evaluate the business interests of one of the parties, establish a valuation date for same and determine a constitutional challenge to the so-called “catch-all” factor set forth in section 236 (part B, subd 5, par d, cl [10]; subd 6, par a, cl [10]) of the Domestic Relations Law. There is a dearth of New York case law dealing with evaluation of closely held or family owned businesses. Of course, there have been some cases dealing with medical or law practices; there have even been cases wherein Internal Revenue Service Ruling 59-60 has been applied. However, in none of these cases were the courts required to, as here, set forth as detailed a formula or graphics in the application of its ruling.
The question of evaluation of a business is indeed a very practical problem which will be before the Bench and Bar in many matrimonial matters for some time to come. In this case, a formula for evaluation of a business making metal, plastic and glass etchings was adopted and utilized by the court in an effort to fix valuation.
By service of a summons on February 8, 1979, plaintiff husband in Action No. 1 (hereinafter husband) commenced an action for divorce against the defendant wife (hereinafter wife) on the ground of abandonment. An answer was interposed denying the essential allegations of the com *662 plaint insofar as the relief for a divorce was concerned, and the wife in that action interposed a counterclaim to impress a trust on the plaintiff’s interest in a closed corporation known as C.A.M. Graphics, Inc. (hereinafter CAM), which interest consisted of 42 V2 shares of an outstanding issued stock of 95 shares, or 44.736% of the outstanding issued stock of the corporation. No counterclaim for divorce (or any other relief affecting the marital status) was interposed by the wife in Action No. 1.
On August 2, 1980, or two weeks after the Legislature modified section 236 of the Domestic Relations Law and created what is commonly known as the Equitable Distribution Law, the wife commenced Action No. 2, in which she seeks a divorce and dissolution of the marriage, and the equitable distribution relief set forth in the statute. Involved in this aspect of the case, and of paramount importance herein, is the fixing of a valuation date and, of course, valuation of the husband’s business, CAM. In this respect, the decision herein ventures into new grounds under the Equitable Distribution Law, grounds for the most part heretofore uncharted.
By order of this court dated October 16,1980 (McGinity, J.), it was directed that both actions be tried jointly.
At the trial, the husband withdrew his action for divorce (Action No. 1) and the wife in that action continued her counterclaim to impress a trust. The husband in Action No. 2 withdrew his defense to that portion of the wife’s action for divorce insofar as the divorce was concerned, and the wife proceeded on that aspect of her action on the grounds of abandonment. The wife sustained her burden of proof on that ground, and the court having proper jurisdiction herein, finds that the wife is entitled to a judgment of divorce dissolving the marriage.
In view of the aforesaid, the only contests herein are the question of the wife’s counterclaim in Action No. 1, the economic aspects of the Equitable Distribution Law as it applies herein in Action No. 2, and counsel fees. The trial of the first two issues encompassed 14 days.
The parties were married on May 29, 1966 and were separated on or about November, 1976. The husband is 41 *663 years of age and the wife is 45 years of age. There are two children of the marriage, James Muller (14) born May 23, 1967, and Elizabeth Muller (12) born April 18, 1969.
When the parties were first married they lived in a house in Locust Valley, New York, rent free, the rent being part of the payment to the wife by the homeowner for the wife’s services as a domestic. The husband worked in a metal etching firm and earned approximately $160-$170 per week.
While the parties lived in the Locust Valley house the husband arranged with the homeowner to do certain “side work” of nonmetal etching and etching silkscreen processing, which was done in the basement of that house for a short time, and also in a rented garage in Hewlett, until the parties moved into the marital residence in North Babylon in July, 1968. Side jobs were done for a short period of time in the basement of the marital residence in North Babylon, after which space was rented elsewhere. At the latter time, around June 30, 1969, the husband and a co-worker, Emanuel Cardinale, formed a partnership (C.A.M. Graphics Co.) placing the name of the business in their respective wives’ names to avoid a possible conflict of interest, inasmuch as both men were employees of Metal Etching Co., Inc., which manufactured products similar to that of C.A.M. Graphics Co. A business certificate for partners was filed on or about July 14, 1969, with 42% shares in the name of Gunter Muller, and 52% shares in the name of Emanuel Cardinale. (Note: five shares were issued to the attorneys who then represented the corporation; thereafter said five shares were redeemed by the corporation.)
According to its certificate of incorporation the purpose of C.A.M. Graphics Co. is to conduct the business of precision services and processes specializing in metal, plastic and glass in all its phases, including screen printing, art work, fabrication screen making and glass and metal etching for signs, decals, scales and escutheons.
THE CONSTRUCTIVE TRUST CLAIM
In Action No. 1, the wife seeks in her counterclaim to impress a trust on the husband’s interest in a closed corporation known as C.A.M. Graphics, Inc.
*664 In the case at bar there does not appear to be a promise, or any testimony of a reliance on any promise implied, or otherwise (Markland v Markland, 67 AD2d 940), and the marriage of the wife and husband does not by itself provide a basis for an implied promise which would support a constructive trust. (Moftiz v Moftiz, 50 AD2d 901.)
It appears to this court that the wife is unable to sustain her burden of proof to establish her rights to a constructive trust here.
Furthermore, the action is barred by the six-year Statute of Limitations pursuant to CPLR 213.
It has been held that as to a constructive trust action the statute runs from the commission, rather than the discovery, of the alleged fraud (Scheuer v Scheuer, 308 NY 447; Motyl v Motyl, 35 AD2d 1051.)
Even if the wife were to get over the threshold question involving Statute of Limitations, she falls short in her proof required to find a constructive trust here.
THE CONSTITUTIONAL QUESTIONS
Specifically, the husband attacks clause (10) both in section 236 (part B, subd 5, par d) and section 236 (part B, subd 6, par a) of the Domestic Relations Law, which has been characterized in various decisions as the “catch-all” or “wildcard” factor. Both subdivisions 5 and 6 of part B of section 236 enumerate 10 factors which the court is required to consider in making awards for equitable distribution of marital property and for maintenance of the wife. In each case nine specific areas of consideration are enumerated; in each case the tenth factor states as follows: “(10) any other factor which the court shall expressly find to be just and proper”.
The husband challenges the constitutionality of this tenth factor on grounds that it fails to meet the requirements of a “Due Process Clause” as it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits, or leaves Judges free to decide, without any legally fixed standards, what is proper, or what is not proper in each particular case. The husband claims that the so-called tenth factor makes the “any other factor” *665 a “matter of definitive absolute determination by the court”, since the statute continues to say that it is to be taken into consideration by the court, “which the court shall expressly find to be just and proper”. Therefore, according to the husband, whatever that particular Judge, who is then sitting at that particular time and place, finds in the case and states that it is just and proper becomes the law of the case.
Statutes are presumed valid and constitutional, and the one challenging the statute has the burden of showing the contrary (McKinney’s Cons Laws of NY, Book 1, Statutes, § 150, subd b). Duly enacted legislation is endowed with a strong presumption of constitutionality (People v Di Carlo, 62 Misc 2d 638), and any doubts should be resolved in favor of the constitutionality or legality of a statute. (Johnson v City of New York, 274 NY 411.) In addition, a statute should be construed if possible, to uphold its constitutionality and in case of doubt, a statute should be given such construction as will, if possible, make it conform to constitutional requirements. (See McKinney’s Cons Laws of NY, Book 1, Statutes, § 150, subd c; People v Ryan, 230 App Div 252.)
The “10th factors” are not unlike the provision in section 236 of the Domestic Relations Law as it existed prior to July 19, 1980, wherein it permitted awards of alimony as “in the court’s discretion, justice requires”. Said terminology withstood a challenge to its alleged vagueness in Vanderbilt v Vanderbilt (1 NY2d 342, affd 354 US 416), where the court found that said term merely means that there are no “as matter of law” requirements, one way or the other, as to those matters which are to be dealt with in the discretion of the court on all the facts.
In New Jersey, where an Equitable Distribution Law has been in effect for a decade, the statute simply provides for the court to “effectuate an equitable distribution of the property”, no factors or standards are enumerated in said statute, and challenges to said statute on complaints of vagueness and violation of due process have been found wanting. (Painter v Painter, 65 NJ 196, 205.)
*666 VALUATION DATE
The court is presented with an issue of first impression at the outset of trial regarding the applicable date for evaluation purposes of marital property under equitable distribution.
The term “marital property” is defined in section 236 (part B, subd 1, par c) of the Domestic Relations Law as follows: “c. The term ‘marital property’ shall mean all property acquired by either or both spouses during the marriage and before the execution of a 'Separation agreement or the commencement of a matrimonial action, regardless of the form in which title is held”.
A matrimonial action is defined in section 236 (part B, subd 2) of the Domestic Relations Law.
Three valuation dates are at issue as follows: (1) Commencement of a Family Court proceeding for support brought by the plaintiff wife in the summer of 1977. This appears to have been followed by the physical separation of the parties by virtue of the removal of the defendant husband from the marital premises on or about January 1, 1977. (2) Commencement of the husband’s action for divorce on or about February 8, 1979. This action was withdrawn without prejudice at the commencement of trial herein. (3) Commencement of the wife’s action for divorce on or about August, 1980.
The court distinguishes those cases in the jurisdiction of New Jersey (Chalmers v Chalmers, 65 NJ 186; Painter v Painter, supra; Ross v Ross, 151 NJ Super 486) mainly because of the statutory language involved. Whereas the New Jersey cases have all interpreted the New Jersey statute, which involves property acquired during the marriage, to require an attempt to ascertain when the marriage no longer was a viable one, the court views the New York statute as being more definitive and certain in terms of time, inasmuch as it couples the phrase “property acquired * * * during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action”. (Domestic Relations Law, § 236, part B, subd 1, par c.)
The Family Court proceeding was not a matrimonial action, as that term is defined in the Domestic Relations *667 Law. There was no separation agreement executed in this case; nor does it follow that merely because a wife seeks support in the Family Court that the marriage is no longer viable, or that she is seeking to terminate the marriage relationship.
The court finds the effective date for evaluation of marital property, here, to be as of February 8, 1979, the commencement of the husband’s cause of action for divorce, notwithstanding the withdrawal of same at commencement of the trial herein. This is significant as to the court’s treatment of the Toledo Street property which will be taken up at the appropriate time.
EQUITABLE DISTRIBUTION CLAIM
The court was presented with two diametrically opposed opinions of valuation for CAM. Said valuations were offered to two experts, both of whom testified that they were familiar with the Internal Revenue Service’s Ruling 59-60 (IRS, Internal Revenue Bulletin [1959], p 237). The expert for the wife utilized Revenue Ruling 59-60 in establishing value of the business as of February 8, 1979.
The expert for the husband said in his testimony that he was familiar with Revenue Ruling 59-60 and that he considered the facts it set forth, but that he did not determine valuation by using the 59-60 method because of the nature of the corporation and that, in his opinion, it was almost impossible to determine valuation based upon the factors set forth in 59-60. Instead, he based his determination of the valuation of the corporation based upon its assets, its book value, the fact that the salaries of the corporate officers were low, and the earnings of the corporation, and factors such as the risk involved of anyone who wants to invest in such a corporation, stagnation of percentage of growth, and the percentage of growth after its one big year.
The husband introduced into evidence Exhibit I — “Buying & Selling a Small Business” — Small Business Management Research Reports prepared by the University of Wichita for the Small Business Administration, which reflects that there are two basic methods by which it is possible to determine the value of a business. “The first — *668 is based on future expectations of profit and return on investment. Such a method forces the parties to the transaction to give at least minimum attention to such factors as trends in sales and profits, capitalized value of business, the expectancy of return on investment”.
“The second method — is based on the appraised value of the assets at the time of negotiation with the presumed notion that these assets will be used in the continuation of the business. This method of valuation gives little consideration to the future of the business but rather determines asset value only as these relate to the present” (p 28).
The fallacies in utilizing the method suggested by the husband’s accountant can be found in the fact the court attributes, as a factor here, hidden income on the part of the husband, which almost doubles the income reported; also, the percentage of the corporation’s growth is camouflaged by attributing to its expenses items which are not really corporate responsibility. Such expenses include Blue Cross/Blue Shield benefits for husband’s paramour, floor waxing at husband’s Locust Valley residence, payment of heat and utility bills at the homes of Emanuel Cardinale (2) and the husband (2). Then there are insurance charges and automobile expenses not attributed to corporate use, and the questionable expense reimbursement account of Emanuel Cardinale and the husband.
The most comprehensive method of valuation available is to be found in the Internal Revenue Service’s Revenue Ruling 59-60 (IRS, Internal Revenue Bulletin [1959], p 237). (Nehorayoff v Nehorayoff, 108 Misc 2d 311.) The court prefers to utilize the said Revenue Ruling, but with some different adjustments than that utilized by the wife’s accountant.
It is interesting to note that the introduction to the Revenue Ruling 59-60 cautions, “A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing these facts and determining their aggregate significance” (p 238). Revenue Ruling 59-60 enumerates eight fundamental factors which should be analyzed in arriving at a valuation:
*669 (a) The nature of the business and the history of the enterprise from its inception.
(b) The economic outlook in general and the condition and outlook of the specific industry in particular.
(c) The book value of the stock and the financial condition of the business.
(d) The earning capacity of the company.
(e) The dividend paying capacity.
(f) Whether or not the enterprise has goodwill or other tangible value.
(g) Sales of the stock and the size of the block of stock to be valued.
(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market.
There was no testimony reflective of item (e), (g) or (h).
To show the wide disparity between the view of the two experts, consider that:
(1) The husband’s expert found the valuation of the business to be $75,000, with the husband’s share fixed _.t $33,750 (45%), with the wife’s share of that calculated at 35%, being $11,812.
(2) The wife’s expert found the valuation of the business to be $322,522, with the husband’s share then fixed at $145,148 (45%), and the wife’s share of that calculated at 80%, being $116,118.
The wife’s attorney also computed value utilizing the stockholders agreement and arrived at a valuation of $300,500, with the husband’s share fixed at $135,225.
Of course, the stockholders agreement provides for a formula for valuing the business and this must be considered, although neither expert indicated that this would be a recommended method for calculating valuation of the business.
The wife’s attorney, using the year ended December, 1978 for his calculations, arrived at valuation pursuant to the stockholders agreement as follows:
*670 Gross Receipts - year ended Dec. 31, 1978 $539,000
Assets = $232,000
Liabilities = 200,000
31,000 [sic]
Book Value of Stock 31,000
Plus 50% of gross receipts for last 12 months 269,500
Total Value Per Agreement $300,500
Husband’s Share = 45% ownership $135,225
The stockholders agreement method, although it may bind the buy-out of one principal from the other, is not binding in terms of valuation in circumstances such as those at bar. The court did not utilize this method of approach.
Fair market value, in the case of any property or commodity, is normally the price at which the commodity or property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts. Of course, closely held corporations, such as CAM, are those corporations, the shares of which are owned by a relatively limited number of stockholders. The result of this situation is that little, if any, trading in the shares takes place. There is, therefore, no established market for the stock and such sales as occur at irregular intervals seldom reflect all of the elements of a representative transaction as defined by the term “fair market value.” (See Revenue Ruling 59-60, §§ 2.02, 2.03.)
Revenue Ruling 59-60 provides in part in section 6 as follows: “In the application of certain fundamental valuation factors, such as earnings and dividends, it is necessary to capitalize the average current results at some appropriate rate. A determination of a proper capitalization rate represents one of the most difficult problems in valuation”.
The court agrees to some extent with the wife’s accountant in his application of Revenue Ruling 59-60, but with certain variations or exceptions.
There are some critical stages in the calculations of the wife’s accountant with which the court disagrees. They exist basically in his treatment of the following areas: (1) *671 Key man treatment; (2) Number of employees of CAM; (3) Prior earnings record without regard to current trends reflecting some tightening up; (4) Adjustments made to profit without allowing for canceled checks totaling $62,783 for alleged disallowed categories.
The wife’s accountant treated neither Emanuel Cardinale or Gunter Muller as “key” men in the operation of CAM. There is no doubt in the court’s mind that both Emanuel Cardinale and Gunter Muller are “key” men in CAM’s organization. They are not only the originators of the organization, but they each uniquely add something to the organization that makes each an indispensable or “key” person. In the absence of each they would have to be replaced, in turn, by a “key” man.
Emanuel Cardinale is the administrator executive who makes the day-to-day administrative/sales decisions of the company. He is at the forefront in the financing decisions in terms of everyday functions, as well as plans for future expansion, development and growth. He appears to be the contact man in terms of corporate finances, investment and development. Gunter Muller, on the other hand, is the plant overseer — the master technician — the idea man for plant operations and production efficiency. He is the one responsible for day-to-day plant production, the source for new ideas in technical progression.
As an investment the “key” man characteristic makes CAM less desirable, and the fact a corporation has two “key” men makes it, to some degree, less desirable than one “key” man. This, of course, effects the multiplication factor of the net earnings.
Another consideration given by the wife’s accountant is the number of employees attributed to CAM. He took into consideration the fact CAM had 44 employees during 1980. However, the average number of employees in any month was approximately 19. In 1980, the gross payroll for CAM was $209,824.84.
The corporate tax returns of CAM reflect growth, as can be seen from the following data extracted from Exhibits Nos. 1-7:
*672 GROSS GROSS TOTAL COMPENSATION TOTAL
YEAR SALES PROFITS INCOME GUNTER MULLER ASSETS
1980 623,343 338,707 339,324 25,029 224,409
1979 567,595 285,104 288,752 16;880 209,726
1978 538,681 301,697 306,626 27,549 231,833
1977 364,651 195,120 196,336 22,213 144,868
1976 299,314 161,974 161,974 20,234 99,462
1975 220,089 117,504 120,916 18,172 91,953
Thus, the very year in which valuation is made reflects an increase in sales over the prior year, but a decrease in gross profits, total income and total assets.
Bank officers testified to various facts indicating growth of CAM, and indicated that the corporation was a highly valued customer with a repayment record which was prompt and without incident. The bank representatives testified that CAM had maintained its accounts in borrowing in a satisfactory manner, that the bank had no problems, and that there was nothing of a derogatory nature about the accounts, and the bank had an excellent relationship with C.A.M. Graphics.
The accountant for the wife in utilizing Revenue Ruling 59-60 in arriving at a valuation for CAM took the 1980 reported taxable income per Form 11205 and then made certain adjustments to build up that income by adding to it certain discrepancies which he found in his audit of certain expenditures — (1) telephone; (2) freight and trucking; (3) commissions; (4) utilities; (5) repairs and maintenance, and (6) entertainment and Christmas. In his audit of 1980 the wife’s accountant created a table of the aforesaid accounts as follows:
Amount Amount Accepted
Reported by Accountant Difference
Telephone 11,708 10,870 838
Freight & Trucking 5,305 4,200 1,100
Commissions 11,753 11,254 699
Utilities 16,318 9,955 6,363
Repairs and Maintenance 12,664 7,282 5,382
Entertainment and
Christmas 9,513 2,110 7,403
Totals 67,261 45,671
*673 Auto Expense (reduced by 70% for
use attributed to husband) 2,117
23,902
In his study of the aforesaid items for 1980 the accountant was unable to verify the total amount reported for these six items when he sought to match claimed expenditures with bills, receipts, vouchers and other proof of payment. A discrepancy of $21,590 was found to exist between the amount reported ($67,261) and the amount readily verifiable ($45,671). In addition, the accountant for the wife did not accept the claimed auto expense attributed to Gunter Muller and reduced the claimed expense, or usage by 70% to $2,117. By adding this $2,117 to the aforesaid $21,590 the wife’s accountant came up with an adjustment figure of $23,902 total. By adding this total adjustment figure of $23,902 to the 1980 reported profit the accountant determined that profit had been understated by 2.29 times that which it should have been. From that calculation derived from the 1980 history the accountant for the wife then multiplied the profit shown for 1974, 1975, 1976, 1977 and 1978 by the 2.29 figure. This is an acceptable practice for IRS purposes.
However, the court finds utilization of the 2.29 figure to be an inaccurate adjustment of profit attributed to those years. The 2.29 multiplicant is not proper, because the bookkeeper for CAM brought in canceled checks totaling $62,783 for the alleged disallowed categories, therefore, reducing the difference to $4,730, instead of $23,902. Further, the disallowance of auto expense (70%) on a corporate rental car used in the business simply because the user (Gunter Muller) runs the plant and is not in sales administration is improper and arbitrary. This further reduces the difference by $2,117, bringing the total adjustment to profit in the sum of $2,613.
The formula to utilize in this case for valuation of C.A.M. Graphics would appear to be that shown in Exhibit No. 117, with, however, an earning power multiplicant of 6 instead of 8 to account for “key” man considerations and an adjustment of 13% for the aforesaid disallowances. The formula process would look like this:
*674 VALUE OF BUSINESS AFTER AUDIT ADJUSTMENTS
1980 REPORTED TAXABLE INCOME
per 11205 = 18,485
PLUS RECOMMENDED ADJUSTMENTS = 2.613
ADJUSTED 1980 INCOME = 21,098
% VARIATION = 13
Reported Income Including Income After Weighted
Credit Adjustment Adjustment Weight Value
1978 26,353 X 13% = 29,779 X 5 = 148,895
1977 17,920 x 13% = 20,250 X 4 = 81,000
1976 13,118 X 13% = 14,823 X 3 = 44,469
1975 8,598 X 13% 9,712 X 2 = 19,424
1974 4,112 X 13% = 4,647 X 1 = 4.647
298,435
Average Weighted Income = 19,896
Business Value with Adjustment E/P6 = 119,376
45% (husband’s share) = 53,719
Once the future earning power has been computed it then remains to find and apply an appropriate multiplier to those earnings. The earnings multiplier is the reciprocal of the capitalization rate, i.e., Investor feels that his investment should be earning 121/2%. This means he is willing to pay 8 times future earning power (121/2% x 8 = 100%).
The court used an earnings power multiplicant of 6 instead of 8 used by the wife’s accountant in order to give effect to the “key” man role of Emanuel Cardinale and Gunter Muller. As an investment the “key” man characteristic makes CAM less desirable and, therefore, effects the multiplication factor. The court then arrived at the sum of $119,376 as the value of CAM as of the valuation date of February 8,1979. Said date represents the date on which the husband commenced his action for divorce against the wife. This represents the uncontrovertible time at which the marriage, for all purposes, is dead.
Based upon her contributions to the husband’s advancement in his business in her role of spouse, mother and helpmate, the wife is entitled to 35% share of the husband’s interest, or $18,801. Inasmuch as it would be improper to make the wife a “partner” in the business, the *675 court, therefore, awards the wife the sum of $18,801 as a distributive award relative to the husband’s share of the business. (Domestic Relations Law, § 236, part B, subd 1, par b.)
The court notes that it does not give any great weight to the husband’s pension rights, since they were de minimis between the time C.A.M. Graphics adopted a plan for the officers and certain employees in 1979, keeping in mind the fact the action for divorce was commenced in February of 1979 and the parties, in fact, had separated in 1976.
The court also determines that the husband’s share of ownership in the Toledo Street property as separate and not marital property, since it was acquired on March 27, 1980, which was after the commencement of the action for divorce. (Domestic Relations Law, § 236, part B, subd 1, par c.) However, said property is considered by the court in connection with the husband’s ability to pay maintenance and child support.
As to the payment of the distributive award the husband shall pay out to the wife the sum of $18,801 as follows: $4,700.25 on or about June 30, 1982, $4,700.25 on or about December 31, 1982, $4,700.25 on or about June 30, 1983, $4,700.25 on or about December 31,1983, unless he chooses instead to deed over to his wife his one-half interest in the marital abode ($12,650) on or before June 30,1982, in which case he shall pay the balance ($6,151) as follows: $3,075.50 on or about December 31, 1982, $3,075.50 on or about June 30, 1983.
[Portions of opinion omitted for purposes of publication.]