(September 14, 1995)

■ In the Matter of the Accounting of ROSE SAKOW, as Executrix of MAX SAKOW, Deceased, Petitioner. EVELYN BRESLAU et al., Respondents, v WALTER SAKOW, Appellant, et al., Respondents. In the Matter of Accounting of ROSE SAKOW, as Executrix of MAX SAKOW, Deceased, Petitioner. EVELYN BRESLAU et al., Appellants-Respondents, v WALTER SAKOW, Respondent-Appellant, et al., Respondents. [631 NYS2d 637] —Order of the Surrogate's Court, Bronx County (Lee L. Holzman, S.), entered on or about April 15, 1994, which, after trial, *inter alia*, dismissed all objections to the account based on claims of respondent-cross-appellant Walter Sakow's fraud, unjust enrichment, and actions as *de facto* executor except as to any

properties which, at any time, were in the name of W.E.D. Corporation, and required respondent-cross-appellant Walter Sakow to account with respect to properties of the W.E.D. Corporation, is unanimously modified, on the law and facts, to the extent of reinstating the claims for fraud and unjust enrichment and requiring the respondent-cross-appellant Walter Sakow to provide an accounting with respect to all properties, and otherwise affirmed, without costs or disbursements. The order of the same court and Surrogate, entered February 2, 1995, which denied the motion by respondent-cross-appellant Walter Sakow for reconsideration, or, in the alternative, to reopen the trial on the ground of newly discovered evidence, is unanimously affirmed, without costs or disbursements.

Max Sakow died in January of 1956. He was survived by his widow Rose, his adult son Walter, 25 at the time and in the military, and two minor daughters, Evelyn, 20 years old, and Diana, 15 years old. The decedent was in the real estate business, owning more than fifty parcels of real estate in Bronx and New York Counties either individually or through various corporations. Other individuals had interests in some of these corporations. One of the corporations was the W.E.D. Holding Corporation. Max's will left one-third of his estate to his wife, Rose, who was designated executrix and two-thirds to the three children, with the shares of Evelyn and Diana to be held in trusts for them until they reached the age of 23. These trusts were never formed.

As found by the Surrogate after a bench trial, Walter, immediately upon his discharge from the military, began to transfer properties belonging to Max or to corporations he controlled to himself or to entities in which Walter had an interest or to third parties who would then reconvey to him. The daughters received support from their mother on a "modest scale" through college but never received any formal distribution from their father's estate. Rose, the executrix *de jure* testified essentially that she left all business decisions to Walter and signed any document he presented to her. She further testified "the fights started" in 1983 when her daughters came to her house and asked her whether their father had left a will. When she disclaimed knowledge of a will they confronted her with a copy of the one in the court file. As noted, the Surrogate found: "The inescapable conclusion to be drawn from this proof is that the witness [Walter] had freely dealt in the decedent's properties and that some had been used as security, some developed, and some retained by Walter, his nominees, or entities in which he had an interest."

Nevertheless, the Surrogate found that the daughters' claim of fraud was time barred since, the objectants admitted they knew of the will in 1983 and, in fact, had hired counsel to trace the properties. The Surrogate found that it was not until 1986 that objections to the accounting filed by Rose were advanced, more than two years after the discovery of the fraud, and, therefore the filing of the initial objections were untimely (CPLR 213 [8]; 203 [g] [actions based on fraud to be commenced within six years or within two years from the discovery of the fraud]). Further the Surrogate found that the statute of limitations had run on the cause of action for constructive trust since more than six years had passed from Walter's alleged actions in taking estate properties. Finally, the Surrogate found insufficient evidentiary support to require Walter to account as the *de facto* executor of the estate since Rose signed all of the deeds and estate tax returns, allegedly knowingly and voluntarily. Initially, we agree with the finding that Evelyn and Diana first became aware of the will and their father's estate no later than 1983, when they hired counsel and confronted their mother with a copy of the will. Further, Evelyn wrote a note to Walter at this time asking what he had done with her share of the estate. However, the fact that Evelyn and Diana began this accounting procedure against their mother as the executrix of the estate in 1984 was not only proper, but entirely reasonable as a first step to determine what had become of the estate properties. Suspicions are not proof, and at that time the sisters did not have sufficient evidence to begin an action against Walter. Rose resisted the accounting and it was not filed for some two years. At that time, for the *first* time, Evelyn and Diana conclusively learned of the properties owned by the estate which were traded to and through Walter and his various entities. Objections were then filed by the daughters against Rose and then against Walter as *de facto* fiduciary. These objections were filed as of July 1, 1986, and the Surrogate chose this as the date the fraud was first asserted.

When the daughters brought the accounting proceeding against their mother they were asserting their right to estate assets. At this time Walter, who was served with a copy of the petition, was put on actual notice of his sisters' claim to receive their just portion of the estate. Accordingly, the statute can be considered tolled at that time, in 1984.

Alternatively, since the filing of this petition for an accounting occurred in July of 1984, and the sisters finally received a first accounting only in April of 1986, they did not have sufficient knowledge of Walter's fraudulent activities to commence

an action for fraud in 1983, when they first became aware of the will. In fact, only after the deposition of Rose in January 1987 did the information as to the role played by Walter and his various nominees emerge. Therefore, under either theory, the claims by the objectants were timely made as to the fraud cause of action.

The facts would warrant the imposition of a constructive trust. In 1990, the Surrogate held that a constructive trust could be imposed if objectants could prove their allegations that Walter used his confidential relationship with them and their mother to deprive them of their rightful inheritance and engaged in self-dealing to enrich himself. The record shows that this *was* proved. Thus, the Surrogate expressly refers to Walter's "self-dealing" in estate assets by which he "helped himself". However, this cause of action accrues when the property in dispute is held adversely to the beneficiary's rights. "A constructive trustee may acquire property wrongfully thus holding it adversely to the beneficiary's interest from the date of acquisition, or he may wrongfully withhold property which he has rightfully acquired from the lawful beneficiary. In either case, the cause of action accrues when the acts occur upon which the claim of constructive trust is predicated, the wrongful withholding." (*Augustine v Szwed*, 77 AD2d 298, 301.)

Thus, it is irrelevant *when* the aggrieved party learns of the wrongful act giving rise to the action. "It is well settled that the Statute of Limitations applicable in actions to impress constructive trusts can be found in CPLR 213 (subd 1), which prescribes a six-year period that commences to run upon occurrence of the wrongful act giving rise to a duty of restitution (*Scheuer v Scheuer*, 308 NY 447; *Mann v Mann*, 77 AD2d 866; *Dolmetta v Uintah Nat. Corp.*, 712 F2d 15, 18) and 'not from the time when the facts constituting the fraud were discovered' (*Motyl v Motyl*, 35 AD2d 1051, 1052; see, also, *Muller v Muller*, 116 Misc 2d 660, 664)." (*Kitchner v Kitchner*, 100 AD2d 954.)

Moreover, we have examined the record and the proof at trial clearly demonstrated that Walter was, in effect, the *de facto* executor of his father's estate. Rose repeatedly testified that she signed anything that Walter put in front of her and there were other witnesses to Walter's assumption of authority. In fact, the Surrogate agreed that Walter had been "the principal decision maker with respect to the disposition of estate assets" (160 Misc 2d 703, 707). The facts show that Walter possessed all of the powers of a fiduciary. He, in effect, disposed of the assets of the estate and the distributions to the beneficiaries without any opposition from his mother. Accord-

ing to the testimony of his former business associates Sheldon Goodman and Richard Mann, Rose was never consulted by Walter with respect to matters of import such as price, etc., although she signed the deeds. She, herself, repeatedly denied any role or knowledge in decisions regarding the sale or transfer of the realty. Further, Walter signed Rose's signature on estate checks at times and dispensed with the signatures and approvals of the beneficiaries also. In fact, Walter brought an action on behalf of the estate to recover property belonging to it, clearly demonstrating his *de facto* executor status. As such, he should account to the beneficiaries of the estate for *all* properties which originated from the estate, since he never openly repudiated his fiduciary status (*see, Matter of King*, 194 AD2d 726; *Matter of Behr*, 191 AD2d 431).

Even assuming, arguendo, that Walter merely assisted his mother in *her* breach of trust toward Evelyn and Diana, Walter would be liable for the full amount of damages caused thereby (*Wechsler v Bowman*, 285 NY 284, 291). "[A]ny person receiving from an executor the assets of his testator, knowing that this disposition of them is a violation of his duty, is to be adjudged as conniving with the executor; and that such person is responsible for the property thus received." (*Matter of Rothko*, 84 Misc 2d 830, 860, *mod on other grounds* 56 AD2d 499, *affd* 43 NY2d 305, citing *Colt v Lasnier*, 9 Cow 320, 342.)

The Surrogate found Walter to be a *de facto* fiduciary of the properties belonging to the W.E.D. Corporation, which was wholly owned by Max at the time of death, on the basis that Walter was never an owner of any shares of W.E.D., yet over the years signed deeds as president of this corporation in order to transfer properties to himself or to entities he controlled. While we expressly find that Walter was a *de facto* fiduciary with respect to all the properties originating from the estate, the evidence is also clear that Walter never owned any of the shares of W.E.D. and simply arrogated to himself the right to sell or develop W.E.D. properties. The "new evidence" presented by Walter on his motion for reconsideration were papers which do not credibly tend to establish that Walter owned any of the shares of W.E.D., and further, could have been discovered earlier with due diligence. Thus, the Surrogate properly denied the motion by Walter for reconsideration or a new trial. Concur—Murphy, P. J., Wallach, Ross, Nardelli and Williams, JJ. [*See,* 160 Misc 2d 703.]