**In re David FISCHER, Debtor.**

**No. 95–17119–608.**

United States Bankruptcy Court,
E.D. New York.

April 7, 2004.

---

Robert J. Kaplan, Esq., New York City, for Defendants.

Rosenberg, Musso & Weiner LLP, Brooklyn, NY, for trustee.

Herzfeld & Rubin, P.C., New York City, for Plaintiffs.

## DECISION AFTER TRIAL

CARLA E. CRAIG, Bankruptcy Judge.

This matter arises in seventeen adversary proceedings brought by a group of plaintiffs ("plaintiffs," "shareholders" or "investors") against debtor David Fischer ("debtor" or "Fischer") and certain of his relatives and affiliates. The complaints assert claims for conversion, breach of fiduciary duty, fraud, accounting, and the imposition of a constructive trust. An eight day trial was held on the issues of whether any or all of the claims asserted in these adversary proceedings are barred under applicable statutes of limitation, and, if so, whether the debtor engaged in conduct which prevents him from asserting that defense. This opinion constitutes the Court's findings of fact and conclusions of law after hearing the evidence adduced at that trial.

### Jurisdiction

This Court has jurisdiction of each of these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(I) and the Eastern District of New York Standing Order of Reference dated August 28, 1986. The adversary proceedings are core proceedings pursuant to 157(b)(2)(A),(B), and (O).

### Background

These adversary proceedings grow out of a long-running dispute within the Lubavitcher Orthodox Jewish community in Crown Heights, Brooklyn (the "Community"), between David Fischer, who was until 1987 a prominent member of the Community, and a group of individuals who claim to be shareholders in corporations set up by Fischer between 1974 and 1976. The following facts, which are not in dispute, provide a partial time line of relevant events.

In the early 1970s, following an appeal by the Lubavitcher Grand Rebbe, the spiritual leader of the Community, to its members to revitalize and improve the housing conditions of the Community, Fischer embarked on a plan to purchase and manage apartment buildings in Crown Heights. (JPTO, Plaintiffs' Contentions of Fact, ¶¶ 2–5; Feb. 27 Tr. p. 174–175.)[1] Between July 1974 and March 1976, together with Zalman Deitsch and Yitzok Gorovitz (also members of the Community), Fischer approached residents of the Community and offered them the opportunity to invest. (Feb. 27 Tr. p. 181.) Each of the investors received shares of stock in a single-asset corporation which acquired an apartment building (the "Properties"). (Feb. 27 Tr. p. 175–178; Plaintiffs' Exs. Nos. 9–16.) Ten such corporations were created, and stock was issued to the plaintiffs in 1974–76. (Id.) Partnership shares in Crown Realty Partnership, also a single-asset entity, were issued to Zalman Deitsch in August, 1977. Eight of these ten corporations and Crown Realty Partnership are at issue in the instant adversary proceedings.[2]

---

**1.** "JPTO" refers to the Joint Pre–Trial Order, dated February 24, 2003; "Tr." refers to the trial transcript by date.

**2.** The eight corporations and Crown Realty Partnership will be referred to collectively as the "Corporations." Attached as Appendix A is a list of the Corporations; the Properties held by each of the Corporations; and the

Fischer, Deitsch and Gorovitz were officers of the Corporations and were responsible for the management of the Properties. (Feb. 28 Tr. p. 117–119.) As Fischer put it,

> [T]his is the way the people who invested the money they rely on Mr. Deitsch and other people on rely on Mr. Gorovitz and other people relied on me. [The investors] were not real estate people. They were regular people, working people. They did not understand. They rely on us to run the property the best way it is possible.

(Feb. 28 Tr. p. 117.)

Although Gorovitz initially maintained the "books, corporate books, check books" relating to the Corporations for approximately half a year, Fischer took over this function because Gorovitz and Deitsch were unable to devote the necessary time to the task. (Feb. 26 Tr. p. 151–154.)

Fischer was more involved with the day-to-day management of the Properties than either Deitsch or Gorovitz, and eventually took responsibility for managing the buildings (March 3 Tr. p. 28.) At this time, Fischer was a well-known and well-respected figure in the Community, because of his work with real estate in the Community, and because of his position as a rabbi, as well as the fact that he served as a rabbinical judge in the Beth Din, or rabbinical court. (Feb. 28 Tr. p. 122–126; March 3 Tr. p. 48–49.) Fischer was also involved in other Community organizations, including the Crown Heights Jewish Community Council (the "Council"), a community organization dedicated to promoting the welfare of Crown Heights residents. (Feb. 28 Tr. p. 19.)

In 1978, without any authorization from the shareholders, Fischer transferred five of the Properties to five limited partnerships in which the shareholders had no interest. (Feb. 27 Tr. p. 204–216; JPTO ¶¶ 2, 5, 8, 10, 12.) These limited partnerships were structured as tax shelters, in which Fischer's majority partner, Silwin Associates, contributed the funds necessary to renovate the Properties and obtained the tax benefits. (Feb. 27 Tr. p. 205–210.) Fischer also mortgaged two of these Properties in 1978, and mortgaged four more of the Properties in the early 1980s. (See Appendix A.) Fischer did not seek any authorization from the shareholders before he transferred or mortgaged the Properties, nor did he tell them after the fact that he had unilaterally transferred or mortgaged the Properties (although the transfers and mortgages were a matter of public record). (Feb. 27 Tr. p. 204–223.) Fischer used the proceeds of these transactions for his own purposes. By 1986, each of the Properties had been sold, or had been mortgaged, with no accounting to the shareholders for the sale or mortgage proceeds. (*Id.*)

Between 1978 and 1985, Fischer issued checks from time to time to the shareholders of the Corporations. (Feb. 28 Tr. p. 76–101.) The parties agree about the dates of the checks and the amounts given to each plaintiff; however, Fischer contends that the checks constituted repayment of the amounts originally invested, while the investors contend that the payments represented profits or dividends distributed on their investments. (JPTO, Plaintiff's Exhibits (CC) to (RRR)).

In 1986, a new group took control of the Council and the prior Council board was ousted. (Feb. 28 Tr. p. 20–21.) Shortly thereafter, the Crown Heights Rabbinical Court, or Beth Din, sent Fischer a summons on behalf of the new Council board directing Fischer to produce all his books

---

date the Properties were transferred or mortgaged by Fischer.

and records pertaining to the Corporations. (Feb. 28 Tr. p. 34–36.) Fischer appeared before the Beth Din and brought certain books and records, but the Beth Din requested materials which Fischer did not provide. (*Id.*, p. 38–39.) On February 23, 1987, the Beth Din issued a "Seruv," a contempt citation and form of excommunication against Fischer for his failure to provide books and records and an accounting of the Properties and the Corporations to the Council. (JPTO, ¶ 20.) Shortly afterwards, on March 18, 1987, the Beth Din issued a "Nedui," declaring that "one may not sit within 4 cubits of [Fischer]," effectively expelling Fischer from the Community. (JPTO, ¶ 21.) As a result of this series of events, Fischer left Crown Heights on March 15, 1987 and moved to Israel. (JPTO, ¶ 22.)

On May 18, 1987, approximately two months after Fischer's departure to Israel, several residents of the Community commenced an action in the Supreme Court of the State of New York, Kings County, alleging that Fischer had misappropriated their interests in the Chanuyot Company. (JPTO, ¶¶ 24, 25; Defendant's Proposed Exhibits, Ex. (V); Feb. 27 Tr. p. 59–60; Feb. 24 Tr. p. 242.). A few days later, on May 21, 1987, the shareholders of Sadov Realty Corporation, also members of the Community, commenced a state court action on behalf of Sadov against Shipur Hashchuna Realty Corporation, an entity owned by Fischer which was the managing agent of real property held by Sadov, alleging (among other things) that Shipur had refused to distribute mortgage proceeds of the property to them and had refused to account for rent received from the property. (JPTO, ¶¶ 28–37; JPTO Defendant's Proposed Exhibits, Ex. (DDD).). Although these lawsuits did not involve any of the Properties, it is significant that the allegations made against Fischer—that he misappropriated other shareholders' interests and failed to account for mortgage and rent proceeds—are similar to the claims made herein.

More than two years later, on July 20, 1989, and November 30, 1989, actions were commenced against Fischer, his relatives and his affiliates, by various residents of the Community who had invested in the Corporations, alleging that Fischer had breached his fiduciary duty, had defrauded them, had wrongfully converted rent, sales and mortgage proceeds of the Properties and the rents, had failed to account to the plaintiffs, and requesting the imposition of a constructive trust.[3] (JPTO, ¶ 38; Defendant's Documentary Supplement Containing Plaintiffs' Complaints, Exs. A and B.) On August 15, 1995, an involuntary bankruptcy petition was filed against Fischer, and on May 6, 1998, an order for relief was entered against Fischer under chapter 7 of the Bankruptcy Code, commencing the instant bankruptcy case. In 1999, plaintiffs filed complaints as intervenors in ten adversary proceedings previously commenced by the Trustee against defendants.[4] The intervenor complaints reiterate the allegations in the July and November 1989 Actions and assert claims for conversion, fraud, imposition of a constructive trust, breach of fiduciary duty, and accounting. (Defendants' Documentary Supplement Containing

---

3. The claims asserted in state court on July 20, 1989 were interposed as counterclaims in an action brought by Fischer and involved 760 Montgomery Street, 679 Montgomery Street, and 658 Montgomery Street. The November 30, 1989 Action involved all the other Properties.

4. Adversary proceedings Nos. 98–1377; 99–1126; 98–1611; 98–1612; 1656; 98–1657; 98–1658; 98–1659; 98–1660; and 98–1661.

Plaintiffs' Complaints, Exs. (J) through (S).) On June 3, 1993, plaintiffs commenced derivative actions in the Supreme Court of the State of New York, Kings County, on behalf of six of the Corporations, alleging claims similar to those asserted in the July and November 1989 Actions. (Defendants' Documentary Supplement Containing Plaintiffs' Complaints, Exs. (C) through (i); Defendant's Charts of the Claims in Issue.) Derivative actions on behalf of the other three Corporations, Givoh Realty Corp., Rachamin Realty Corp. and 760 Montgomery Street Corp., were commenced two years later, on August 18, 1995. *Id.* On August 31, 2001, the July and November 1989 Actions (which had been severed into seven separate actions by order of the state court), and the derivative actions were removed from state court to this Court.[5]

Beyond this basic outline, the parties have widely diverging views of the facts.

*Fischer's Testimony*

According to Fischer, by the late 1960s Crown Heights had "deteriorated" considerably. (Feb. 27 Tr. p. 174–75.) Encouraged by the Grand Rebbe's vision of improving housing in the Community, Fischer, Deitsch and Gorovitz sought out members in the Community willing to invest in apartment buildings. (Feb. 27 Tr. p. 182–186.) Between 1974 and 1977, with financial assistance from the investors, Fischer formed the Corporations, which issued shares to the investors and purchased the Properties. Although some small distributions were initially made to the investors, distributions ceased in 1976 due to the financial problems of the Properties. (Feb. 27 Tr. p. 186–187.) Fischer's inability to rent apartments because of the deteriorated condition of the Properties made it diffi-

cult for him to pay operating expenses. (Feb. 27 Tr. p. 190–191.) Faced with an income stream insufficient to cover "oil bills, real estate tax, mortgage, insurance," he began to discuss with Deitsch and Gorovitz possible sources of the funds needed to stabilize the Properties, such as additional loans or government assistance. (Feb. 27 Tr. p. 197; March 3 Tr. p. 34–40.) In 1977, tired of juggling unpaid bills and dodging creditors, Fischer decided to offer two choices to the other shareholders: they could invest additional money and keep their shares in the Corporations, or their shares and interests in the Corporations would be extinguished. (Feb. 27 Tr. p. 197–198).

Fischer was not concerned about whether he had the authority to make this decision.

Q: Did you have total authority to make decisions at this time?

A: It was not a question of authority. The building cannot be run. I told them either you invest money or you people will not be no more investors."

(March 3 Tr. p.43.)

Fischer testified that he presented this ultimatum to each of the shareholders. (March 3 Tr. p. 45–46.) According to Fischer, these conversations took place between late 1977 and early 1978, in various locations—in his office, in his house, on the street. (Feb. 27 Tr. p.195.). Fischer testified that, upon being presented with this ultimatum, the shareholders told him that they did not wish to invest any more money. (Feb. 27 Tr. p. 201.) At least some of the shareholders asked about getting their investment back. Fischer testified:

Q. Did you promise them any money?

---

5. The derivative actions were removed as adversary proceedings: (01–1413; 01–1414; 01–1418; 01–1419; 01–1420; 01–1421; 01–1367) (the "Derivative Actions").

A. I told them if they are not investing any more money, they have nothing to do, they are not going to be no more shareholders in the buildings, and I told them, I, in the next years, God will help me, I will have money. I don't need do it, but I will do it. I don't want you people to say I stole your money. You invested. You lost your money. I didn't want for them to think. I told them, I will do everything that is possible to repay their investment they put into the building.

(Feb. 27 Tr. p. 201.)

Fischer considered this undertaking to be in the nature of a moral, not a legal obligation. (March 3 Tr. p. 253.) Nevertheless, Fischer testified, he eventually returned the money that each shareholder invested in the Corporations. (Feb. 27, 2003 Tr. p. 202.) [6]

After the shareholders refused to invest more money, Fischer testified, he considered their interests to have been extinguished, and dealt with the Properties as though he were the sole owner of the Corporations. He testified that he did not make a point of telling the investors about the subsequent transactions in which the Properties were sold or mortgaged (although he told several investors who asked), because there was no need to:

Q. Do you go out of your way to tell them?

A. No, not at all.

Q. Why not?

A. They having nothing to do with the properties. No more shareholders.

It my headache. My properties. Now I'm dealing with that now. . . .
(Feb. 27 Tr. p. 205.)

Fischer did not repay the investors in any systematic way, but paid those investors first that "bother[ed]" him more:

Q: We have that straight now. From late 1977, so that is '78, '79, '80, '81,- '82, into sometime in '83, almost six years later, was the first payments you made on a transaction that you completed in late '77, is that your testimony?

A: Yes. Like I said before, I did not need really to give them back the money. I did it on my own. When somebody came to me like I said in 1979, '80, '81, there was no money. Therefore, I didn't look for people to give them back the money. People who came to me and they requested, they got it. Some people requested more. They got it faster. Some people bother me more, they got it faster.

(March 3 Tr. p. 93–94.)

In 1978, Fischer began the renovation of each of the Properties, and the renovations were completed, in 1980 for several of the Properties, and in 1982 for others. (Feb. 28 Tr. p. 3–19.) The Properties were rented a year or two of the completion of renovations, and stabilized financially within a short time thereafter. (*Id.*) The renovations of the Properties were a "big thing in [the Community]." (Feb. 28 Tr. p. 18–19.)

According to Fischer, the investors began to ask him for the return of their investments after the renovations were completed. (March 3 Tr. p. 91–94.) Fischer did not obtain share certificates

---

**6.** Fischer testified he did not pay Hirsch Chitrick because Chitrick had sold him a building which, in his view, had no value, and there-fore Fischer did not feel any moral obligation to repay him. (March 3 Tr. p. 110–111.).

from some of the plaintiffs, even after he had repaid them in full. (Feb. 28 Tr. p. 83–85.) Fischer testified that he did not attach much importance to possession of the share certificates:

Q: Those people that did not give [the share certificates] back to you, did you run after them to get it back from them?

A. No.

Q. Why not?

A: I told them they are no more shareholders and that is it. I also told them that there will come a time when I will repay you back your investment like what I said before. It was not a big meaning. But that stock certificate, I told them it has nothing to do with the property. They are no more shareholders. That is it.

(Feb. 28 Tr. p. 84–85.)

In 1986, elections for a new Council board were held, and the old board was voted out. (Feb. 28 Tr. p. 20–21.) The new board brought claims against Fischer alleging that certain buildings that he owned belonged to the Council. (Feb. 28 Tr. p. 21.) Fischer testified that the board sent around a letter soliciting members of the Community to assert claims to the Properties. (Feb. 28 Tr. p. 21–22.) Ultimately, Fischer was summoned to the Beth Din, and produced all the books and records he possessed at the time. (Feb. 28 Tr. p. 34–38.) Fischer testified that he opposed the election of one of the new board members, and believed that the board brought claims against him in retaliation, to oust him from the prominent position he held in the Community. (Feb. 28 Tr. p. 35–36; p. 39–41.) The board requested additional books and records, which Fischer testified he did not possess. (Feb. 28 Tr. p. 36–39.) Fischer's failure to produce additional books and records led

to the issuance of the Seruv and Fischer's excommunication on March 18, 1987, three days after his departure for Israel on March 15, 1987. (Feb. 28 Tr. p. 49–51; JPTO ¶¶ 20–22.)

*Plaintiffs' Testimony*

Some of the plaintiffs testified that they became acquainted with Fischer in social settings. (Feb. 24 Tr. p. 60–62.) Some of the plaintiffs met Fischer as a fellow student while studying in religious school. (Feb. 25 Tr. p. 50–51; Feb. 25 Tr. p. 229.) Other plaintiffs met Fischer through business. (Feb. 24 Tr. p. 102–103.) All the plaintiffs testified that Fischer approached them, between 1974 and 1975, and offered them the opportunity to invest in various apartment buildings in the Community, with a view to improving Community housing conditions, as well as profiting financially from the investment. (Feb. 25 Tr. p. 56; Feb. 24 Tr. p. 209; Feb. 24 Tr. p. 106–107.) The plaintiffs testified that they trusted Fischer, because he was a Rabbi and an important figure in the Community. (Feb. 24 Tr. p. 80–81; Feb. 24 Tr. p. 133–134; Feb. 24 Tr. p. 209.) Although the plaintiffs received small distributions on their investments for a short time, these distributions stopped in 1976. (Feb. 27 Tr. p. 186–187.) Plaintiffs testified that they were aware that the Properties were being renovated and that they believed that profits on their investments would not be available until the renovations were completed, and therefore did not inquire whether they could receive any distributions until the early 1980s. (Feb. 24 Tr. p. 215–216.) All the plaintiffs testified that they never agreed to sell, transfer, or assign their shares. (Feb. 25 Tr. p. 55–56; Feb. 24 Tr. p. 212, 225; Feb. 25 Tr. p. 244, 249.)

The plaintiffs' testimony diverged from Fischer's testimony on several key points. First, plaintiffs generally testified that, at the time they initially invested, Fischer

promised them "profits" on their investments. (Feb. 26 Tr. p. 9, 90; Feb. 24 Tr. p. 106–107, 209; Feb. 25 Tr. p. 56, 232.) Second, plaintiffs testified that Fischer repeatedly, over the years, assured them that their investments were secure, and that they would eventually receive "profits." (Feb. 26 Tr. p. 12, 97–98; Feb. 24 Tr. p. 133, 215–216; Feb. 25 Tr. p. 62–63.) Third, some of the plaintiffs testified that, in lieu of distribution of profits or dividends on their investment, Fischer gave them or their relatives "free rent" in buildings which he owned. (Feb. 25 Tr. p. 143–146; Feb. 24 Tr. p. 230–232.) All these assertions are denied by Fischer. (March 3 Tr. p. 72.)

Plaintiffs' testimony was vague in a number of important respects, and failed to provide any significant credibility-enhancing detail concerning conversations with Fischer regarding their investments in the Properties or the circumstances, such as time and place, surrounding these conversations. In addition, cross examination revealed a number of inconsistencies between plaintiffs' trial and deposition testimony. Moreover, testimony offered in support of plaintiffs' critical factual contention in this trial—that Fischer lulled them into believing that their investments were secure and that they would receive distributions in the future—had a distinctly rehearsed quality, as though plaintiffs were parroting a key point on which they had been coached. These factors combine to undermine plaintiffs' credibility.

The following excerpts illustrate some of the problems with plaintiff's testimony.

Polly Slavin testified as follows:

Q: What did Rabbi Fischer say to you when you asked him for money in the 80's? Just what you told us, right?

A. Yes.

Q: What did he say to you? Was he going to give you money?

A: He said he was going to give to me, yes.

Q: Did he say the buildings were profitable?

A: I don't remember talking that.

Q: Did he ever show you a financial statement?

A: Never.

Q: Did you ever ask to see the financial statement?

A: I don't think I asked.

Q: You just used the word profits, was that the word Rabbi Fischer used?

A: I think Rabbi Fischer. What does he give me money for? What else?"

(Feb. 24 Tr. p. 251.)

Mr. Minkowitz's testimony was vague concerning the substance of his conversations with Fischer. He testified that he did not remember anything about his initial conversation with Fischer, Gorovitz and Deitsch (which, he said, lasted for several hours (Feb. 26 Tr. p. 109)) except that "tremendous profits" were promised. This is in contrast to his deposition testimony, in which he stated that he "can't tell the details" regarding this conversation. At trial, his memory regarding promises of "tremendous profits" was "refreshed."

Concerning his initial conversation with Fischer, Deitsch and Gorovitz in 1975, Mr. Minkowitz testified:

Q: He told you there would be tremendous profits?

A: Yes.

＊　　＊　　＊　　＊　　＊　　＊

Q: Anything else that he told you about the property?

A: No. I had full trust, full confidence in Mr. Fischer. We were close friends and I didn't need specific promises and so on and so forth.

Q: Other than these tremendous profits that you would get, you don't know any other details of that conversation?

A: No.

(Feb. 26 Tr. p. 110–111.)

At his deposition, on March 15, 2002, he testified:

Q: What did he say to you [at the 1975 initial meeting with Deitsch, Fischer and Gorovitz]?

A: Well, he was buying buildings at that time in the neighborhood and he needed people to invest it and he drafted me to invest with him.

Q: You were reluctant?

A: Well, I wasn't sure and he convinced me to do it.

Q: What did he tell you?

A: I can't tell the details.

But at trial his memory was refreshed:

Q: And today your memory was refreshed regarding details about the tremendous profits that he promised you, correct?

A: Correct.

(Feb. 26 Tr. p. 110–112.)

Concerning his conversations with Fischer after his initial investment, he gave the following vague and formulaic testimony:

Q: Did you continue to see or to meet with Rabbi Fischer after 1975?

A: Yes.

Q: How frequently would you say that occurred?

A: Very often.

Q: Can you give us–

A: Sometimes every day. Sometimes a couple of times a week.

Q: Did you have any discussions with him regarding this investment?

A: Yes, I did.

Q: Can you give us the substance of those discussions?

A: Well, the questions were how are the properties doing and how are they functioning. Answer was always it's very good and he is working on-to maintain the properties, to reinvest monies in the properties to improve the buildings and so on.

\* \* \* \* \* \*

Q: What was the nature of those discussions?

A: Just inquired what the properties are doing, profits and so on and so forth. And the answer was everything is okay and he is trying his best.

(Feb. 26 Tr. p. 91–93.)

Q: In 1980, did you continue to see Rabbi Fischer and speak with him?

A: Yes.

Q: And tell us, not every conversation, but those that related to your business interests with him, the nature of your conversations in 1980?

A: You mean concerning the buildings?

Q: Yes.

A: How the buildings were doing and everything was fine and money was being made to invest in and to improve the buildings and to keep it up.

(Feb. 26 Tr. p. 97–98.)

The other plaintiffs' testimony relating to their conversations with Fischer concerning the security of their investments in the Properties also had a rehearsed and conclusory quality, as the following excerpt from Joshua Laufer's trial testimony shows:

Q: And without being repetitious, in the years 1983, '84, '85, were you continuing your practice of visiting the community?

A: Yes, I was.

Q: And just again, tell us what your contacts were with Mr. Fischer during those visits?

A: I considered him a good friend. I would ask him how the buildings were doing and he would say right now we are taking the money and we are repairing or renovating and upgrading.... He always reassured me that profits would be forthcoming in the future. (...)

(Feb. 24 Tr. p. 132–133.)

Q: And you're still following the practice of these visits?

A: Correct.

Q: And did you receive any monies in 1985?

A: No.

Q: And on these visits, you did have conversations with him?

A: Yes.

Q: Did he tell you on those occasions anything different that what he had been telling you previously?

A: No.

(Feb. 24 Tr. p. 135.)

Q: So each year after you made these investments you asked him for profits; am I correct?

A: Whenever I met him I asked him how the buildings were doing, how were the conditions of the buildings, how was the rentals of the buildings. (...)

(Feb. 24 Tr. p. 148.)

Joseph Frimmerman likewise gave vague testimony concerning his conversations with Fischer:

Q: When you say you spoke to Rabbi Fischer on occasion and you inquired what's doing with the buildings? Is there a profit and so forth? Do you recall the substance of the response?

A: In the early 80's, the substance of the response was the buildings are going to be turned around shortly. We are going to see profits. Be patient.

Q: In 1981, do you recall having discussions with him?

A: I can only narrow it down to the early 80's. (...) but there were several discussions through '84. On many different occasions I met him in the office. I met sometimes on the fly. I was always confident and encouraged that things would turn out good.

Q: Did you meet him outside the office or outside in the neighborhood on any other particular occasion?

A: I remember once or twice going into his office. We had a quick discussion. He assured me that we're on track.

(Feb. 25 Tr. p. 63–64.)

Several of the plaintiffs gave vague answers to other important questions. For example, Mrs. Slavin could not remember which Properties were the source of the profits she claims to have received. (Feb. 24 Tr. p. 240.) Nor could she remember other significant facts, such as whether she asked Fischer to show her the books and records of the Corporations she had invested in, or when she learned about Fischer's sale of the property which triggered the commencement of the Chanuyot Action, in which she participated in as a plaintiff. (Feb. 24 Tr. p. 225, 242.) Another plaintiff, Rabbi Raitport, had similar memory problems, as the following excerpt shows:

Q: Prior to going to lawyer in 1984, when was the first time that you considered going to the lawyer?

A: In '83–'84. I can't remember.

Q: I'm trying to find out when did you have enough of getting rejected every time you asked Rabbi Fischer for money that you decided to go to a lawyer. In other words, it didn't happen on the day you went. Approximately how much before?

A: I don't recall. We have to have a Psak. I call. I'm not only man. I don't want to be the first man.

Q: Why did you go to the lawyer in 1984 if you were awaiting everyone?

A: Wait so much for everything else.

Q: Did you ask him for financial information in 1977?

A: I don't know.

Q. Did you ask him for financial information in 1978?

A. I don't remember.

Q: You don't remember anything between 1977–

A: He was a man I believed everything he says.

Q: Why was 1983 the limit?

A: Everything comes to an end.

Q: What made it come to an end?

A: I don't know."

(Feb. 25 Tr. p. 254–255.)

In addition, Rabbi Raitport's testimony departed significantly in several instances from his deposition testimony, further undermining his credibility. (Feb. 25 Tr. p. 272–274; 274–276.) At trial, Rabbi Raitport testified that he had several conversations with Fischer regarding his investments, but, at his deposition, asserted that he did not remember what Fischer told him when he asked for money, and generally showed an almost complete lack of recollection of events. (Feb. 25 Tr. p. 263–264.)

Comparison of other plaintiffs' trial and deposition testimonies reveals several discrepancies on key issues. For example, Rabbi Joshua Laufer testified that, in 1983, in lieu of profit distributions, Fischer gave a "credit of the partial amount of rent" to his brother, Mottel Laufer, who lived in one of the Properties. (Feb. 24 Tr. p. 131.) However, at his deposition, on January 10, 2002, Joshua Laufer did not mention that his brother received any rent credits, nor did he generally "recall what transpired 20 years ago or more." (Feb. 24 Tr. p. 151–154.) Polly Slavin also testified that her daughter received free rent in lieu of dividends paid to Mrs. Slavin on her investments. (Feb. 24 Tr. p. 230–232.) Like Joshua Laufer, however, Mrs. Slavin did not mention this at her deposition, and testified that she "didn't expect what [she] thought 30 years ago when [she] spoke to David Fischer" and couldn't even remember "what [she] thought yesterday when [she] spoke to [her] daughter." (Feb. 25 Tr. p. 22.) Slavin's explanation at trial of why she did not mention the "free rent" story at her deposition lacks credibility:

Q: When you asked after the investment, what else did you do with Rabbi Fischer, you didn't tell me about the free rent then?

A: I didn't understand what you meant when I did, what I did. I spoke to him. I thought you were only asking me, did I do anything to get money from him? I wasn't getting any more money.

Q: What? Free rent is not getting money?

A: Yeah.

Q: It is getting money, right?

A: At that point, I did not associate this with this. That's what I think.

(Feb. 25 Tr. p. 15–16.)

Slavin's response is consistent with the notion that she believed she had received a return of her investment: she "did not

associate" the free rent given to her daughter with her investment because she believed they were not connected.

The other plaintiffs, particularly Deitsch, also failed to present credible testimony on their dealings with Fischer. For example, the Joint Pre–Trial Order states that Deitsch would testify that he consented to the sale of some of the Properties to tax shelter limited partnerships, with the understanding that the shareholders would retain their interests in the Corporations, and that the Corporations would remain general partners in the newly formed partnerships. (JPTO, p. 66.) However, at trial, Deitsch testified that he did not know that any of the Properties were transferred to tax shelter limited partnerships, and did not even know that partnerships were created, or even the meaning of the term "partnerships." (Feb. 27 Tr. p. 130–138.)

It is significant, too, that four plaintiffs who testified at trial admitted in cross-examination or at prior deposition testimony that they did not report the distributions they received from Fischer on their tax returns, as they would have been required to do if the payments were dividends, rather than return of capital. (Feb. 24 Tr. p. 157–158; Feb. 25 Tr. p. 3–6; Feb. 25 Tr. p. 90–92; Feb. 25 Tr. p. 261.) Such conduct is inconsistent with plaintiffs' assertion that they believed that the monies they received from Fischer after 1978 were distributions of profits.

In weighing the evidence, this Court is mindful of the Second Circuit's instructions in Cifra v. General Electric Company, 252 F.3d 205, 215 (2d Cir.2001), concerning the standards to be applied by a federal court sitting as a trier of fact:

> [W]hen the district court is sitting as trier of fact, it has no obligation to draw a given inference merely because it is supportable; nor has it any obligation, in its capacity as trier of fact, to view the evidence in the light most favorable to the plaintiff. The obligations of the court as the trier of fact are to determine which of the witnesses it finds credible, which of the permissible competing inferences it will draw, and whether the party having the burden of proof has persuaded it as fact finder that the requisite facts are proven.

In the instant case, the parties agree that these are core proceedings, and the district court has delegated its fact-finding authority to this Court pursuant to the Eastern District of New York Standing Order of Reference dated August 28, 1986.

Fischer's testimony is, on the whole, significantly more credible than plaintiffs'. His story is internally consistent, although it does not entirely redound to his credit. He testified that he told the plaintiffs that they were "no more shareholders," even though he had no legal right to unilaterally take away their interests in the Corporations. (Feb. 27 Tr. p. 198.) This account of events is believable because it is consistent with the behavior of a person who, frustrated by his inability to get the financial help needed to stabilize the Properties, decided to take matters into his own hands, whether or not he had the right to do so.

Fischer's testimony is also consistent with the fact that at least four of the plaintiffs who testified at trial failed to report the monies they received from Fischer as income on their tax returns, as they would have been required to do if they believed the payments were dividends. It is also consistent with the fact that the plaintiffs did not insist on seeing the books and records or seek to compel Fischer to make more distributions when the Properties were apparently fully rented and operating profitably. It is consis-

tent, too, with the fact that plaintiffs did not take any legal action against Fischer to recover their interests in the Corporations until more than two years after Fischer was publicly discredited and expelled from the Community. Plaintiffs' delay suggests that they considered themselves to be "no more shareholders" and therefore felt no pressing need to protect interests that they believed had been extinguished.

Also relevant to the credibility of Fischer's testimony is Fischer Exhibit 1, which purports to be minutes of a meeting of the officers of Mivzah Realty Corp. held in April 1978, attended by Fischer, Deitsch and Gorovitz. (Additional Exhibits Received in Evidence at Trial, Fischer 1.) The document describes the many problems with 836 Montgomery Street, and states that Fischer "was taking it upon himself to assume all the responsibilities of paying off the suppliers and creditors as well as raising the funds so as to be able to make the necessary repairs," and further states that the investors would be "told to return their papers and documents to Rabbi Fischer" because "[t]hey would be relinquishing all rights and future claims to the Corporation and the property." (*Id.*) This document was used by plaintiffs on cross-examination of Fischer to challenge the credibility of his testimony and the accuracy of his memory, and was received into evidence pursuant to the rule of completeness, Fed.R.Evid. 106, and in fact is consistent with and supports the credibility of Fischer's testimony.

Whether or not any of the plaintiffs in fact expressly or tacitly agreed to permit Fischer to buy out their investments; whether Fischer paid the plaintiffs the amount of their initial investments; or whether, as plaintiffs contend, testimonial evidence of such a transaction would be excluded under the statute of frauds, are issues which need not be decided at this time. The fact that Fischer informed the plaintiffs that he was taking over their interests in 1978 is significant for statute of limitations purposes. The question, therefore, is given this fact, do any of plaintiffs' claims survive the statute of limitations? This question must be answered in the negative.

*Plaintiffs' Claims for Imposition of a Constructive Are Trust Time–Barred*

■ Plaintiffs have asserted an equitable claim for imposition of a constructive trust, for which the applicable statute of limitations is the six-year period provided in CPLR § 213(1) for "an action for which no limitation is specifically prescribed by law." Citing New York cases holding that "[t]he applicable six-year statute of limitations does not commence to run in favor of a trustee until he openly repudiates the trust and asserts and exercises individual ownership over the trust property," *Matter of the Estate of Hyman Alpert,* 234 A.D.2d 150, 651 N.Y.S.2d 451 (1st Dept. 1996), plaintiffs argue that Fischer did not openly repudiate the trust until February, 1987, when he was called before the Beth Din, "which alerted the plaintiffs of the debtor's conduct." (Plaintiffs' Supplemental Post–Trial Brief, p. 2.) Therefore, plaintiffs contend, actions commenced within six years of that date (including the July and November 1989 actions) were timely.

This argument is factually flawed. Repudiation occurred in 1977–78, when Fischer told the plaintiffs they were "no more shareholders," and proceeded to deal with the Corporations as though he was the sole owner. It is difficult to imagine a clearer or more open repudiation of any trustee-beneficiary relationship that may have existed.

Plaintiff's argument is legally flawed as well. In determining when the statute of limitations for a constructive trust claim

begins to run, New York courts have held that it commences "upon occurrence of the wrongful act giving rise to a duty of restitution" and "not from the time when the facts constituting the fraud were discovered." *Accounting of Rose Sakow,* 219 A.D.2d 479, 631 N.Y.S.2d 637, 640 (1st Dept.1995) (quoting *Motyl v. Motyl,* 35 A.D.2d 1051, 1052, 317 N.Y.S.2d 73); *Lammer v. Stoddard,* 103 N.Y. 672, 673, 9 N.E. 328,. 329 (1886) (where defendant never acknowledged a trust as to money loaned and was never the actual trustee of a trust fund, the statute of limitations for constructive trust claim began to run from the time that plaintiff loaned money to the defendant, as that is the date when a wrongful act, if any, occurred); *Mazzone v. Mazzone,* 269 A.D.2d 574, 703 N.Y.S.2d 282 (2d Dept.2000) (statute of limitations for constructive trust claim began to run from the date of the alleged wrongful transfer of the property); *Dybowski v. Dybowska,* 146 A.D.2d 604, 536 N.Y.S.2d 838 (2d Dept.1989) (statute of limitations for constructive trust claim began to run at the time that defendant fraudulently took title to plaintiff's property in her name, and statute of limitations was not extended or tolled when she later refused to convey her interest in the property to plaintiffs); *Augustine v. Szwed,* 77 A.D.2d 298, 300–301, 432 N.Y.S.2d 962 (4th Dept.1980) (statute of limitations for constructive trust claim began to run from the time the property was held adversely to plaintiff's interest).

In considering this issue, New York courts have drawn a distinction between the commencement of the limitations period where the defendant is the trustee of an actual or express trust, and where the defendant did not undertake to hold property in trust, but is claimed to be a constructive trustee by reason of his wrongful conduct (a trustee *ex maleficio*). See *Talmage v. Russell,* 74 A.D. 7, 76 N.Y.S. 854 (2d Dept.1902); *Yeoman v. Townshend,* 74 Hun 625, 627, 26 N.Y.S. 606, 609; NYJUR Trusts § 140 Limitations and Laches (2003); NYJUR Trusts § 358 Termination or Repudiation of Trust as Prerequisite to Start Running of Statute of Limitations (2003). This distinction is explained by the Court of Appeals in *Lammer v. Stoddard,* 103 N.Y. 672, 673, 9 N.E. 328, 329:

> It is undoubtedly generally true that as against a trustee of an actual, express, subsisting trust, the statute [of limitations] does not begin to run against the beneficiary until the trustee has openly, to the knowledge of the beneficiary, renounced, disclaimed, or repudiated the trust. But Edward Lammer was not the actual trustee of this fund, and he never acknowledged a trust as to the money loaned him. He could, at most, have been declared a trustee *ex maleficio* or by implication or construction of law; and in such a case the statute begins to run from the time the wrong was committed by which the party became chargeable as trustee by implication.

Thus, the commencement of the statute of limitations for the imposition of a constructive trust will be triggered by the constructive trustee's wrongful conduct, which gives rise to the constructive trust, whether or not this conduct is made known by a clear and open repudiation. By contrast, where the defendant has undertaken the responsibilities of a trustee pursuant to an express or actual trust (whether or not embodied in a formal written document), the statute of limitations will only begin to run upon clear and open repudiation of these responsibilities.

The case law supports this distinction, and the cases relied upon by the plaintiffs all involve the breach of an express or actual trust, and are therefore distinguish-

able from the instant case. For example, in *Matter of Ashheim's Estate,* 111 App. Div. 176, 177, 97 N.Y.S. 607 (*aff'd*) (1st Dept.1906), the court held that the statute of limitations did not begin to run in favor of an executor, in possession of trust funds which he failed to turn over to a trustee named in the will, until he openly repudiated the trust and asserted individual ownership over the trust property and plaintiffs were made aware of this conduct. Here, Fischer was not a trustee, nor did he have possession of plaintiffs' shares, as the executor in *Ashheim* had. Rather, the plaintiffs owned their shares in the Corporations directly, and Fischer later transferred the Properties, the assets of the Corporations, to third parties, and mortgaged the Properties and transferred these proceeds to himself. The other cases relied upon by plaintiffs also involve executors or estate administrators who held funds in trust for beneficiaries of the will and are therefore not applicable to the facts in this case. *See, e.g., In re Barabash's Estate,* 31 N.Y.2d 76, 334 N.Y.S.2d, 890, 286 N.E.2d 268 (1972) (mere listing in letter of administration by administrator of estate that he is the sole distributee is not sufficient to constitute repudiation of trust so as to commence running of statute of limitations); *Matter of Meyer's Estate,* 98 A.D. 7, 90 N.Y.S. 185 (1st Dept 1904) (statute of limitations will only begin to run in favor of defendant, who took possession of property of testator and assumed duties of executor, at the time he openly repudiates the trust); *Matter of the Estate of Hyman Alpert,* 234 A.D.2d 150, 651 N.Y.S.2d, 451 (1st Dept 1996) (the six-year statute of limitations does not commence to run in favor of trustee until he openly repudiates the trust).

■ Plaintiffs' argument that Fischer was an actual trustee by virtue of his role as director of the Corporations is also flawed. Directors of a corporation, despite their fiduciary duties as "guardians of the corporation," are not trustees. See *Chambers v. Blickle Ford Sales, Inc.,* 313 F.2d 252, 258 (2d Cir.1963) ("But New York has not gone quite as far as to say that corporate directors, even of a corporation in liquidation, are actual trustees"); *Spencer v. Standard Chemicals and Metals Corporation,* 237 N.Y. 479, 143 N.E. 651 (1924) (although rules permitted a trustee of an express trust to bring a cause of action in his own name on behalf of his client, court held that attorney, despite the expansive fiduciary duty owed to his client, was not a trustee); and *Caballero v. Anselmo,* 720 F.Supp. 1088, 1096–98 (S.D.N.Y.1989) (minority shareholder's cause of action against the director of the corporation for breach of fiduciary duty as trustee was dismissed because court found that the existence of an actual trust had not been proved "beyond a reasonable doubt").

For these reasons, plaintiffs' constructive trust claims accrued at the time that the wrong was committed by Fischer which gave rise to the claim. This occurred when Fischer told the plaintiffs that they were "no more shareholders" and proceeded to act as the owner of their interests in the Corporations. But even if Fischer had not told plaintiffs in 1977–78 that he was taking over their interests (which, for the reasons stated above, this Court finds that he did), the statute of limitations began to run long before Fischer's ouster from the Community. With respect to the Transferred Properties, the limitations period for a constructive trust claim began to run at the latest when the Properties were sold in 1978, and therefore expired in 1984. (See Appendix A.) With respect to the Mortgaged Plaintiffs, the constructive trust claims accrued at the latest when the Properties they were mortgaged and the proceeds appropriated. The 577–87 Empire Boulevard Property

was mortgaged on July 31, 1981, the 760 Montgomery Street Property was mortgaged on November 28, 1983, the 824–36 Montgomery Street Property was mortgaged on February 14, 1984, and the 456 Brooklyn Avenue Property was mortgaged on May 29, 1986. (See Appendix A).

■ Plaintiffs' constructive trust claims must fail for an additional reason. A plaintiff is barred from asserting a constructive trust claim where he or she has an alternative adequate remedy at law. *United States v. Ribadeneira*, 920 F.Supp. 553, 556 (S.D.N.Y.1996), *aff'd*, 105 F.3d 833 (2d Cir.1997); see also *Gold Sun Shipping, Ltd. v. Ionian Transp. Inc.*, 245 A.D.2d 420, 666 N.Y.S.2d 677, 678 (N.Y.App.Div. 1997) (where damage remedy is adequate, the shorter statute of limitations governing conversion claims applies to the plaintiff's constructive trust claim); *Norris v. Grosvenor Marketing Limited*, 803 F.2d 1281, 1287 ("An equitable claim cannot proceed where the plaintiff has had and let pass an adequate alternative remedy at law").

■ Here, plaintiffs were investors in the Corporations which owned the Properties; they were never owners of nor had any interest in the real property itself. Their interest in the Properties was solely financial; they are not claiming that any unique feature of any of the Properties was important to them.

Courts may find that legal remedies are not adequate compensation for real property losses if plaintiff's interest in the property relates to some unique feature of the property, such that the loss cannot be compensated by money damages. See *Medgar Evers Houses Associates, L.P. v. Carro*, 2001 WL 1456190, *4–*6 (E.D.N.Y. 2001) (court declined to grant plaintiff equitable remedy in the form of a preliminary injunction barring defendant from foreclosing on real property where plaintiff

failed to show that it had some personal or emotional attachment to the property and plaintiff was solely interested in the commercial value of the property) (citing *JOGO Assocs. v. U.S. Dep't of Hous. & Urban Dev. et al.*, Civil Action No. 92–2451(NHJ)(D.D.C. Nov. 25, 1992)). See also *Geneva Ltd. Partners v. Kemp*, 779 F.Supp. 1237, 1241 (N.D.Cal.1990) ("while real property is often judicially perceived as unique, in this case plaintiffs are faced with loss of commercial, and not residential, property. They are thus threatened with an economic loss which is compensable in large part, if not entirely, in damages.") (collecting cases).

Plaintiffs' claims arising from the loss of their interest in the Corporations (and, indirectly, in the Properties) can be compensated by money damages, and the conversion and breach of fiduciary duty claims, both legal claims, would have afforded Plaintiffs an adequate remedy. For this reason, the constructive trust claims are hereby dismissed with respect to all of the Properties.

*Plaintiffs' Conversion Claims Are Barred by the Statute of Limitations*

■ "Conversion is the 'unauthorized and wrongful exercise of dominion and control over another's personal property'." *Phansalkar v. Anderson Weintroth & Co., L.P.*, 175 F.Supp.2d 635, 639 (S.D.N.Y. 2001) (quoting *Pioneer Commercial Funding Corp. v. United Airlines, Inc.*, 122 B.R. 871, 883 (S.D.N.Y.1991)). Plaintiffs allege that Fischer engaged in acts of conversion by transferring title to certain Properties to tax shelter limited partnerships, and pocketing the proceeds derived from the subsequent sale of these Properties to third parties, and by misappropriating the mortgage proceeds derived from the Properties. (JPTO, Plaintiffs' Contentions of Fact, ¶¶ 34–38.)

Even accepting the argument that plaintiffs' conversion claims accrued when the Properties were transferred or mortgaged, rather than when Fischer told plaintiffs they were "no more shareholders," the conversion claims are time-barred. The transfers of five Properties to tax shelter partnerships took place during the latter half of 1978. (See Appendix A.) A cause of action for conversion is governed by a three-year statute of limitations which begins to run at the time of conversion. CPLR § 214(3); *Sporn v. MCA Records*, 58 N.Y.2d 482, 487–488, 462 N.Y.S.2d 413, 448 N.E.2d 1324 (1983) (cause of action for conversion accrues when the possessor "first began using plaintiff's property as its own"); *Song-Byrd, Inc. v. Grossman*, 206 F.3d 172 (2d Cir.2000) (conversion claim accrued when defendants first began using tapes as their own by licensing portions of them on their own behalf). "Generally, the statute of limitations for a conversion claim begins to run when the conversion occurs and not when the conversion is discovered or when plaintiff exercises diligence to discover it." *Calcutti v. SBU, Inc.*, 224 F.Supp.2d 691, 691–702 (S.D.N.Y.2002); *Ely–Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 599 N.Y.S.2d 501, 615 N.E.2d 985 (1993) ("discovery" exception to the running of the statute of limitations is strictly limited to claims for fraud); *SongByrd, Inc. v. Grossman*, 206 F.3d at 183 ("New York has not required a demand and refusal for the accrual of a conversion claim against the possessor who openly deals with the property as its own."). A claim for conversion therefore accrued no later than 1978 with respect to the five transferred Properties, and the statute of limitations accordingly expired in 1981.

With respect to the other four Properties, the conversion claim accrued at the latest when Fischer first mortgaged those Properties and used the mortgage proceeds for his own benefit, without the consent of Plaintiffs. *Sporn v. MCA Records*, 58 N.Y.2d 482, 487–488, 462 N.Y.S.2d 413, 448 N.E.2d 1324 (1983) (cause of action for conversion accrues when the possessor "first began using plaintiff's property as its own"). Fischer mortgaged 760 Montgomery Street on November 28, 1983 and mortgaged 456 Brooklyn Avenue on May 29, 1986. (JPTO, ¶¶ 15, 17.) Plaintiffs first asserted a conversion claim with respect to 760 Montgomery Street on July 20, 1989, and with respect to 456 Brooklyn Ave., on November 30, 1989. Both complaints were filed after the three year statute of limitations for conversion expired, and, as a result, the cause of action for conversion with respect to both of these Properties is time-barred.

The property located at 577–87 Empire Boulevard was first mortgaged by Fischer on July 31, 1981, and 824–36 Montgomery Street was mortgaged on February 14, 1984. (JPTO, ¶¶ 13, 14, 19.) A conversion claim with respect to these Properties was first interposed on November 30, 1989. As a result, the conversion claim is also time-barred with respect to both of these Properties.

*Breach of Fiduciary Duty Claims*

A. *Plaintiffs' individual claims for breach of fiduciary duty are dismissed.*

Plaintiffs alleged that Fischer, as "trusted fiduciary agent", and as officer and director of the Corporations, owed a fiduciary duty of good faith, fair dealing, trust and honesty to the plaintiffs, which he breached by failing to account to the Plaintiffs for the income and expenses of the Properties and fraudulently converting to has own use the rents, profits, mortgage and other proceeds of the Properties. (JPTO, Plaintiffs' Contentions of Fact, p. 25–53.) Generally, in actions against di-

rectors for waste or misappropriation of corporate assets, "redress is sought, not in the individual right of the minority stockholders, but through the corporation." *Gordon v. Elliman,* 306 N.Y. 456, 460–61, 119 N.E.2d 331 (1954); see also *Abrams v. Donati,* 66 N.Y.2d 951, 953, 489 N.E.2d 751, 498 N.Y.S.2d 782 (1985) ("For a wrong against a corporation a shareholder has no individual cause of action, though he loses the value of his investment ... [A]llegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only...."). However, as the *Abrams v. Donati* court observed, "exceptions to that rule have been recognized when the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged...." *Id.* For example, in *In re Estate of Schulman,* 165 A.D.2d 499, 568 N.Y.S.2d 660, 663 (1991), the court found that a confidential relationship existed between the individual stockholder and Schulman, the deceased, a trusted personal friend and advisor. The court held that the confidential relationship gave rise to a fiduciary duty, which was "separate, distinct from and more pervasive than the fiduciary duties generally owed shareholders by a corporate officer and director. Therefore the [stockholder] could sue directly for her losses...." *Id.* See also *Giblin v. Murphy,* 97 A.D.2d 668, 469 N.Y.S.2d 211, 215 (1983) (plaintiff permitted to maintain direct action due to defendant's breach of independent duty to plaintiff arising out of stock pledge agreement between the parties); *Chalmers v. Eaton Corp.,* 71 A.D.2d 721, 419 N.Y.S.2d 217, 218–220 (1979) (direct action by plaintiff permitted when defendant breached independent duty to plaintiff arising out of joint venture agreement). In each of these cases, the independent duty arose from a separate agreement or special relationship between the parties. In general, unless the damage suffered by the shareholder is a personal injury, specifically affecting him, and not the other shareholders, courts will not permit the plaintiff shareholder to sue the director or officer of the corporation directly, but only derivatively, for the damage to the corporation. *Niles v. New York Cent. & Hudson Riv. R.R. Co.,* 176 N.Y. 119, 68 N.E. 142 (1903).

■ In the instant case, plaintiffs have not established the existence of any separate agreement or special relationship between the plaintiffs, as shareholders, and Fischer which would permit them to maintain a direct action against Fischer for breach of fiduciary duty. The damages arising from Fischer's alleged breach of fiduciary duty to the shareholders were to the Corporations as a whole, and the shareholders' fractional interests suffered accordingly, but no shareholder suffered damages separate and distinct from the other shareholders. Plaintiffs therefore may not assert individual claims for breach of fiduciary duty against the directors and officers of the Corporations, and therefore the claim for breach of fiduciary duty is dismissed.

■ Even if plaintiffs had made the showing necessary to maintain a direct action against Fischer for breach of fiduciary duty, their claims would still be time-barred. New York law provides different limitations periods for breach of fiduciary duty claims depending on the nature of the relief sought. See *Whitney Holdings, Ltd. v. Givotovsky,* 988 F.Supp. 732, 741 (S.D.N.Y.1997). Breach of fiduciary duty claims which are equitable in nature have a six-year statute of limitations, while claims seeking money damages and alleging injuries to property are governed by a three-year limitations period. (CPLR §§ 213(1), 214(4).) Any breach of fiducia-

ry duty owed by Fischer to the other shareholders of the Corporations occurred no later than 1977–78, when Fischer told them that he was taking over their interests in the Corporations. Thus, even if a six-year statute of limitations is applied (which would be the case if the plaintiffs were properly able to seek equitable relief), any breach of fiduciary duty claim is time-barred.

## B. *The Derivative Claims are time-barred.*

Where a corporation sues a former or present officer or director for breach of fiduciary duty, CPLR § 213(7) provides a six-year statute of limitations. The Derivative Actions are governed by this limitations period.

The general rule is that breach of fiduciary duty claims under CPLR § 213(7) accrue upon breach rather than on plaintiff's imputed or actual discovery of the breach. However, New York courts have held that, in the case of actual fraud, a breach of fiduciary duty claim accrues upon discovery of the fraud, rather than upon the breach itself. *Whitney Holdings, Ltd. v. Givotovsky,* 988 F.Supp. at 744 (citing *Myer v. Myer,* 271 A.D. 465, 66 N.Y.S.2d 83, 93 (1st Dept.1946); *Ripley v. International Ry. of Cent. America,* 196 Misc. 798, 95 N.Y.S.2d 202 (Sup.Ct.N.Y. 1949)). By contrast, breach of fiduciary duty claims under CPLR § 213(7) based on constructive fraud accrue upon breach rather than discovery of the fraud. *See, e.g., Quadrozzi Concrete Corp. v. Mastroianni,* 56 A.D.2d 353, 356, 392 N.Y.S.2d 687 (2d Dept.1977) ("A cause of action predicated upon the ground of constructive fraud must be commenced within six years from the date of the commission of the fraud").

In the instant case, even if it is assumed that the derivative claims did not accrue until plaintiffs' actual or imputed discovery of Fischer's wrongdoing, they are time-barred. Plaintiffs became aware of facts which gave rise to a duty to inquire into the status of the Corporations and their assets no later than March 1987, when Fischer was excommunicated and fled to Israel. Indeed, plaintiffs concede that they were "alerted ... of the debtor's conduct" earlier, in 1986, when Fischer was called before the Beth Din. (Plaintiffs' Supplemental Post–Trial Brief, p. 2.) The Derivative Actions were commenced on or after June 3, 1993 (with the exception of three actions which were commenced approximately 2 years later, on August 18, 1995). Thus, the Derivative Actions were commenced, at the earliest, more than two months after the expiration of the six-year limitations period, which expired no later than in March, 1993 (See Defendants' Charts of the Claims in Issue). The derivative claims are therefore time-barred.

## *Plaintiffs' Fraud Claims Are Barred by the Statute of Limitations*

In their claim for common law fraud, Plaintiffs alleged that, at the time they made their investments in the Corporations, Fischer made material misrepresentations "that there would be profits distributed in the future and an accounting made," knowing these representations to be false, and that Plaintiffs relied detrimentally on such representations in purchasing shares in the Corporations. (Complaint, ¶ 26.)

A fraud cause of action arises upon the making of a misrepresentation causing detrimental reliance. See *Block v. First Blood Associates,* 743 F.Supp. 194, 198 (S.D.N.Y.1990) (holding that the alleged fraud occurred no later than the date the plaintiffs first invested in purported reliance on a report) (citing *Marathon En-*

terprises, Inc. v. Feinberg, 595 F.Supp. 368, 371–72 (S.D.N.Y.1984)); see also Rickel v. Levy, 370 F.Supp. 751, 755 (S.D.N.Y.1974) Causes of action for fraud are governed by two separate alternative limitations periods: six years from the commission of the fraud or two years from actual or imputed discovery of the fraud, whichever is longer. CPLR § 213, subd. 8 and § 203(f); Plaintiffs' Contentions of Fact ¶¶ 62–64. 1 Weinstein, Korn & Miller, New York Civil Practice, ¶ 213.25 at 2–177. See Shannon v. Gordon, 249 A.D.2d 291, 670 N.Y.S.2d 887 (2d Dept. 1998).

In this case, the fraud claims accrued in 1974–76, when the plaintiffs invested in the Corporations. (JPTO; Appendix A.) Plaintiffs, however, contend that they began to learn of Fischer's wrongful conduct in March 1987. "The two year discovery rule for assertion of a fraud claim may begin to run before a plaintiff actually discovers that a fraud has been committed. If a plaintiff could with reasonable diligence have discovered the fraud at an earlier date, the two year limitations period begins to run on the date the fraud could have been discovered." 1 Weinstein, Korn & Miller, New York Civil Practice, ¶ 213.25 at 2–382; Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir.1983) ("where the circumstances are such as to suggest a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth ... knowledge of the fraud will be imputed to him") (quoting Higgins v. Crouse, 147 N.Y. 411, 416, 42 N.E. 6 (1895)).

Here, it is difficult to see how plaintiffs could not have been put on inquiry notice of the existence of their fraud claims when Fischer told them he was taking over their interests, in 1977–78.

Certainly, however, plaintiffs were aware of numerous facts which "were sufficient to have put the plaintiffs on notice and created a duty of inquiry," at the latest, in March, 1987, and therefore the two year statute of limitations began to run at that time. See TMG–II v. Price Waterhouse & Co., 175 A.D.2d 21, 22–23, 572 N.Y.S.2d 6 (1st Dept.1991). In their contentions of fact in the Joint Pre–Trial Order, plaintiffs allege that in December 1986, the Council demanded an accounting from Fischer "of his stewardship of buildings acquired by him on behalf of Chebro and/or Chevra and/or the Community Council"; and that Fischer "so strongly resisted" these demands that the Beth Din excommunicated Fischer and he fled to Israel on March 15, 1987. (JPTO, Plaintiffs' Contentions of Fact, ¶¶ 62–64.) There is no dispute that these events were widely known in the Community, and that the excommunication was publicly announced. A person of ordinary intelligence, learning that Fischer had been expelled from the Community and fled to Israel after refusing to account for his "stewardship of buildings," would be on notice to inquire into the status of his investment with Fischer. Id.

Moreover, two of the plaintiffs, Zalman Deitsch and Polly Slavin, were not only plaintiffs in the Chanuyot and Sadov lawsuits, filed on May 18, 1987, which alleged that Fischer misappropriated properties in which these plaintiffs had an interest, but also submitted affirmations in these actions which revealed, at the very least, strong suspicions regarding Fischer's honesty in his business dealings with members of the Community. (JPTO, ¶¶ 24–27; see also Feb. 24 Tr. p. 242–243.) Sam Malamud, a plaintiff in the Sadov lawsuit, testified that "there was talk in the [C]ommunity" regarding Fischer's investigation by the Council and the Beth Din regarding his "accounting" of the Properties by 1986,

and, although he professed that he had not "lost complete trust in [Fischer]" by 1986, his deposition contradicted this testimony. (Feb. 26 Tr. p. 39–42.) Rabbi Raitport testified that he went to a lawyer in 1987, after having received no response from Fischer regarding his requests for payment on his investments through 1986 and 1987. (Feb. 25 Tr. p. 246, 265–266, 279.) Indeed the Plaintiffs, at trial, confirmed that they became aware of ownership issues with regard to the Properties and of allegations of wrongful conduct by Fischer at the time of Fischer's excommunication and the commencement of the Chanuyot and Sadov lawsuits.[7]

Consequently, with respect to the two year statute of limitations arising upon discovery of fraud, the statute of limitations began to run, at the latest, in March 1987, and expired two years later in March 1989, approximately four months before the July 1989 complaint was filed, and approximately nine months before the November 1989 complaint. The fraud claim is therefore time-barred.

*Plaintiffs' Claim for Accounting Is Barred by the Statute of Limitations*

In their claim for accounting, plaintiffs alleged that Fischer did not account to them for the income and expenses of the Corporations, or for the proceeds generated by the Properties from 1977 through 1987, despite their repeated demands for an accounting between those dates. (November 1989 Complaint, ¶¶ 160–162, 202, 205; JPTO, Plaintiffs' Contentions of Fact, ¶¶ 49–57.) A cause of action for accounting is governed by a six-year statute of limitations and accrues when the duty to pay arises. CPLR § 213; see *Golden Pacific Bancorp v. Federal Deposit Insurance Corporation,* 273 F.3d 509, 518 (2d Cir.2001) (citing *In re Barabash's Estate,* 31 N.Y.2d 76, 80, 334 N.Y.S.2d 890, 286 N.E.2d 268) (N.Y.1972); see also *Glynwill Investments, N.V. v. Prudential Securities, Inc.,* 1995 WL 362500, *3 (S.D.N.Y.1995) (six-year statute of limitations applies to accounting cause of action, which accrues at time the duty to pay arises) (citing *Bernstein v. LaRue,* 120 A.D.2d 476, 501 N.Y.S.2d 896, 898 (2d Dept.1986)). The statute of limitations for the accounting claims began to run when Fischer told plaintiffs he was taking over their interests, in 1977–78, and expired six years later.

*Plaintiffs' Claim for the Equitable Tolling of the Statute of Limitations for all the Claims is Dismissed*

Plaintiffs contend that, throughout the 1980's, and until Fischer's excommunication by the Beth Din in December of 1986, Fischer repeatedly reassured them that their investments in the Properties were secure and that profits on these investments would be forthcoming, and that these alleged statements lulled them into a false belief that Fischer was not engaging in any wrongful conduct and that their investments were secure. Plaintiffs con-

---

7. All the testifying Plaintiffs, except Joshua Laufer and Joseph Frimmerman, testified that they became aware that the ownership of the Properties was in dispute in 1986–87. (Feb. 24 Tr. p. 90; Feb. 24 Tr. p. 242–243; Feb. 25 Tr. p. 246, 255–257; Feb. 26 Tr. p. 40–42; Feb. 26 Tr. p. 126–128; Feb. 25 Tr. p. 65–69; Feb. 25 Tr. p. 147–149.) Some, like Hirsch Chitrick, and Mottel (Robert) Laufer, testified that they became aware of problems through community investigations prior to the excommunication, whereas others, like Sam Malamud and Mayer Minkowitz testified that they became aware of these issues following the excommunication, or, like Polly Slavin, at the commencement of the Chanuyot and Sadov lawsuits. (*Id.*) However, even Joshua Laufer and Joseph Frimmerman testified that, although they only learned of the problems later, they nevertheless had "vague knowledge" of the Beth Din proceeding in 1986–87. (*Id.*)

tend that Fischer's conduct thus delayed the filing of complaints against defendants until 1989, and that the commencement of the statute of limitations for all of the claims should therefore be equitably tolled.

First of all, as a factual matter, for all the reasons explained above, this Court finds that plaintiffs' testimony that Fischer assured them repeatedly between 1977 and 1987 that their investments were secure, was not credible: it was vague, lacking in specific details, and had a distinctly rehearsed quality. Instead, this Court finds that Fischer told plaintiffs that he was taking over their interests in 1978, and that he did not reassure them of the safety of their investments or treat them as shareholders at any time after that. Plaintiffs' claim that the statute of limitations for any of their claims should be tolled by equitable doctrines of tolling or estoppel is therefore rejected as unsupported by the factual record.

■■■■ But even if plaintiffs' testimony that Fischer lulled them into a false sense of security between 1977 and 1987 is taken at face value, their claims are still time-barred. Under the federal doctrine of equitable tolling (or fraudulent concealment), "the statute of limitations will be tolled if the plaintiff pleads, with particularity, the following three elements: (1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." *Butala v. Agashiwala,* 916 F.Supp. 314, 319 (S.D.N.Y.1996). The federal doctrine of equitable estoppel, another equitable exception to the statute of limitations defense, "precludes a party from raising a statute of limitations defense when his own misconduct has caused the other party to delay in bringing an action". *In re FYM Clinical Laboratory, Inc.,* 1997 WL 666238, *4 (S.D.N.Y.1997). "Under federal law, equitable estoppel differs from fraudulent concealment in that it 'is invoked in cases where the plaintiff knew of the existence of the cause of action but the defendant's conduct caused him to delay bringing his lawsuit." *Statistical Phone Philly v. NYNEX Corp.,* 116 F.Supp.2d 468, 484 (S.D.N.Y.2000). "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." *Buttry v. General Signal Corp.,* 68 F.3d 1488, 1493 (2d Cir.1995) (citing *Heckler v. Community Health Services,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)).

■■■■ Under New York law, "[i]t is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 448–449, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978). As under federal law, however, "[t]he doctrine of equitable estoppel will not apply if the plaintiff possesses 'timely knowledge' sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations." *Harris v. Wilmorite Corp.,* 266 A.D.2d 902, 697 N.Y.S.2d 439, 440 (4th Dept.1999) (quoting *McIvor v. DiBenedetto,* 121 A.D.2d 519, 520, 503 N.Y.S.2d 836 (2d Dept.1986)). Unlike federal law, however, New York state law does not differentiate between doctrines of fraudulent concealment (equitable tolling) and equitable estoppel. See *Statistical Phone Philly v. NYNEX Corp.,* 116 F.Supp.2d at 484 (finding that the doctrines of fraudulent concealment and equitable estoppel are analyzed in the same

manner) (citing *Meridien Int'l Bank Ltd. v. Government of Republic of Liberia,* 23 F.Supp.2d 439, 446 (S.D.N.Y.1998)).

 The federal doctrine of equitable estoppel is incompatible with Plaintiff's assertion that they did not know of their claims against Fischer until 1987, and therefore is inapplicable to the facts in this case. See *Statistical Phone Philly v. NYNEX Corp.,* 116 F.Supp.2d at 484 (a necessary condition for a claim of equitable estoppel is that plaintiffs were aware of their cause of action but delayed bringing suit because of fraud or misrepresentations of the defendant). Although authority on this point is divided, the Second Circuit "appears to regard concealment as a tolling rule to which borrowed state law applies." *Pearl v. City of Long Beach,* 296 F.3d 76, 83–84 (2d Cir.2002) (citing *Keating v. Carey,* 706 F.2d 377, 381–82 (2d Cir.1983)). However, under federal or state law, the equitable tolling doctrine is not applicable to the facts in this case.

 Plaintiffs allege that Fischer actively misled the Plaintiffs into believing that their investments were secure, from the time they initially purchased their shares, until 1987. (See Plaintiff's Post–Trial Brief, p. 37.) Under New York law, the "due diligence on the part of the plaintiff in pursuing discovery of their claims and in bringing his action is an essential element for the applicability of the doctrine of equitable estoppel. . . . [t]he burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." *Simcuski v. Saeli,* 44 N.Y.2d at 450, 406 N.Y.S.2d 259, 377 N.E.2d 713; *Metzeler v. Bouchard (In re Metzeler),* 66 B.R. 977, 981 (Bankr.S.D.N.Y.1986) ("The doctrine has application only where the plaintiff has 'exercised reasonable care and diligence in seeking to learn the facts which would

disclose fraud, and [u]nawareness of facts or law, alone, does not justify suspending the operation of the statute.' ") (quoting *Arneil v. Ramsey,* 550 F.2d 774, 781 (2d Cir.1977)); *Freschi v. Grand Coal Venture,* 767 F.2d 1041, 1047 (2d Cir.1985), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731 (1986) (stating that satisfaction of plaintiff's duty of inquiry may require a "rather painstaking investigation"). Even if plaintiffs' testimony is accepted as true, plaintiffs fail to sustain their burden to show that they exercised due diligence in bringing their causes of action within a reasonable time after the facts giving rise to the estoppel had ceased to be operational.

Plaintiffs were on inquiry notice of their claims against Fischer, at the latest, in March, 1987 when Fischer was excommunicated and fled to Israel after refusing to account to the Council for his "stewardship of buildings." (JPTO, Plaintiffs' Contentions of Fact, ¶¶ 62–64.) Any facts giving rise to estoppel would have ceased to be operational no later than that date. (Plaintiff's Post–Trial Brief, p. 37.) Courts have construed due diligence as "a reason to suspect the probability of any manner of wrongdoing." *Zola v. Gordon,* 685 F.Supp. 354, 367 (S.D.N.Y.1988); *Klein v. Shields & Company,* 470 F.2d 1344, 1345, 1347 (2d Cir.1972) (constructive knowledge of claims imputed to appellant because "with reasonable diligence" he could have discovered his claims by certain date since "[a]t that point in time, at least the possibility of fraud should have been apparent . . ."). The fact that plaintiffs waited to commence litigation until the end of 1989, over two years after Fischer was discredited and expelled from the Community, precludes any application of equitable estoppel, particularly in the absence of any showing by Plaintiffs of the exercise of due diligence in discovering and asserting their

claims. See *Department of Economic Development v. Arthur Andersen & Co.*, 747 F.Supp. 922, 944 (S.D.N.Y.1990) (court held that fact that third-party plaintiff did not allege in its complaint what inquiry it took to investigate the possibility of bringing claims after its suspicions were aroused in July 1984 and in early November 1985 failed to satisfy plaintiff's due diligence requirements to avoid the bar of the statute of limitations).

Plaintiffs do not explain for why they did not bring lawsuits against Fischer in 1987. Plaintiffs' lack of diligence is all the more evident given that most if not all of them were aware of (and some even participated in) the *Sadov* and *Chanuyot* actions, which were commenced against Fischer alleging wrongdoing in his management of apartment buildings in the Community in May 1987, only two months after Fischer's excommunication.

Plaintiffs have therefore failed to sustain their burden of proof to show that the statute of limitations applicable to the claims in their complaint should be equitably tolled.

*Conclusion*

For the foregoing reasons, plaintiffs' claims are dismissed.

IT IS SO ORDERED.

## APPENDIX A

| Corporations | Properties | Partnerships to which Properties were transferred, Dates of Transfers, and/or Mortgages |
|---|---|---|
| KZHB Realty Corp. | 349 Crown Street, Brooklyn, NY | KZHB Associates (9/25/78) Transfer: 9/27/78 Mortgage: 9/27/7 |
| Nachla Realty Corp. | 7 Balfour Place, Brooklyn, NY | Nachla Associates (3/1/78) Transfer: 3/13/78 Mortgage: 7/10/79 |
| Habracha Realty Corp. | 675 Empire Blvd., Brooklyn, NY | Habracha Associates (9/25/78) Transfer: 11/9/78 |
| Rachamin Realty Corp. | 679 Montgomery St., Brooklyn, NY | Rachamin Associates (2/24/78) Transfer: 2/28/78 |
| Givoh Realty Corp. | 658 Montgomery St., Brooklyn, NY | Givoh Associates (9/25/78) Transfer: 9/26/78 |
| Crown Realty Partnership | 577–87 Empire Blvd., Brooklyn, NY | 1st Mortgage: 7/31/81 2nd Mortgage: 12/2/86 |
| 760 Montgomery St. Corp. | 760 Montgomery St., Brooklyn, NY | 1st Mortgage: 11/28/83 2nd Mortgage: 12/20/85 |
| CHLC Realty Corp. | 456 Brooklyn Ave., Brooklyn, NY | Mortgage 5/29/86 |

Mivzah Realty Corp. 824–36 Montgomery St., Brooklyn, NY 1st Mortgage: 2/14/84 2nd Mortgage: 12/2/86